EL PUEBLO DE PUERTO RICO, apelado, *v.* RAÚL HERNÁNDEZ MERCADO, apelante.

*Números:* CR-87-115 *Resueltos:* 21 de mayo de 1990
 CR-87-98

428

430

*Víctor M. Agrait Defilló*, abogado del apelante; *Rafael Ortiz Carrión, Procurador General*, y *Awilda Irizarry Pardo, Procuradora General Auxiliar*, abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

Nuevamente, en un caso revestido de interés público, nos corresponde dirimir el conflicto entre el derecho de un acusado a un juicio justo e imparcial y el derecho de la prensa a informar lo que ocurre en el proceso investigativo y judicial por unos acontecimientos que conmovieron al país.

Mediante apelación, el joven Raúl Hernández Mercado impugna el fallo —condenatorio por unanimidad— de un Jurado por los delitos de asesinato en primer grado, tentativa de robo, robo e infracción a los Arts. 6 y 8 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. secs. 416 y 418. Ante nos sostiene, entre otros, que las reseñas de los periódicos sobre la acusación y el juicio por la muerte de Natalio Bayonet Tartak le privaron de su derecho a un juicio justo e imparcial. También sostiene que se cometieron errores en su identificación y en la admisibilidad de su confesión. Examinada cuidadosamente la extensa transcripción de la evidencia y los excelentes alegatos de las partes, confirmamos la sentencia apelada.

I

El Ministerio Público presentó contra Raúl Hernández Mercado —de dieciséis (16) años— acusaciones por los delitos de asesinato en primer grado, robo, tentativa de robo y violación a los Arts. 6 y 8 de la Ley de Armas de Puerto Rico, *supra*. Se le imputó dar muerte al adolescente Natalio Bayonet Tartak utilizando un arma de fuego que portaba ilegalmente mientras intentaba cometer el delito de robo. Además se le inculpó la comisión del delito de robo al apropiarse ilegalmente del automóvil de los jóvenes Juan Ramón Pérez Pérez y Carmen Milagros Lucca, mediante el uso de violencia e intimidación.

Por estos hechos el Tribunal de Menores renunció a su jurisdicción y el apelante fue juzgado en el tribunal ordinario para adultos. *Pueblo en interés menor R.H.M.*, 126 D.P.R. 404 (1990).

La prueba evaluada por el Jurado consistió en que durante la Semana Santa, el 14 de abril de 1987, a eso de las 8:15 P.M., el

joven Natalio Bayonet Tartak y su señora madre, Doña Norma Tartak de Bayonet, fueron a buscar unas películas religiosas a un club de video ubicado en la marginal del expreso Baldorioty de Castro en Isla Verde. Una vez en el lugar, Bayonet Tartak estacionó su vehículo SAAB y junto a su madre fue a la caseta de autoservicio de la tienda. Al no conseguir las películas que buscaban, Bayonet Tartak se retiró hacia su automóvil, quedándose la señora Tartak de Bayonet hablando con unos empleados del negocio. T.E., págs. 914–947.

De regreso a su automóvil se le acercó de frente un "joven delgado, de pelo claro, lacio y bajito" y comenzó a hablar con él. Minutos después se escuchó una detonación y Bayonet Tartak cayó al suelo herido. El "joven delgado" salió corriendo en dirección a un vehículo donde se encontraba el testigo Efraín López Leván, para luego internarse en unos árboles cercanos al lugar. T.E., págs. 954–956.

Detrás del referido negocio se encontraban Juan Ramón Pérez Pérez (sentado en la acera) y su novia Carmen Milagros Lucca (dentro de su automóvil) conversando. Pérez Pérez había oído la detonación, pero pensó que se trataba de unos "petardos". Acto seguido observó a una persona corriendo hacia ellos, que describió como rubio, bajito y flaquito con la nariz achatada y *portando un revólver en su mano izquierda.* Esa persona se acercó y amenazó a ambos testigos: *"bájate del carro o te voy a pegar otro tiro a ti, como a él."* T.E., pág. 1080. Pérez Pérez se retiró del automóvil hacia atrás como unos cinco (5) pies. Entonces, el asaltante ordenó a Carmen Milagros Lucca que se bajara del automóvil y le entregara las llaves. Luego de observar al asaltante y verificar que portaba un arma en su mano izquierda, ella se bajó del vehículo y le entregó las llaves. Inmediatamente el agresor entró al vehículo y huyó del lugar.

Acto seguido Pérez Pérez, que vive en el lugar donde ocurrió este incidente, buscó su arma, para la cual tiene autorización, su automóvil y emprendió una peligrosa persecución tras él. Durante la persecución, que se extendió por toda la Avenida Baldorioty de Castro hasta el Túnel de Minillas en Santurce, el testigo disparó

y chocó en varias ocasiones el automóvil conducido por el asaltante. Como consecuencia de esos impactos el asaltante perdió el control del carro que conducía al internarse en el Túnel de Minillas. A pesar de eso, pudo escapar saliendo del túnel y tomando la carretera que conduce al Expreso Las Américas. Pérez Pérez continuó siguiéndolo y, cerca del puente que hay en la mencionada carretera, volvió a impactarlo. El asaltante perdió definitivamente el control del carro. Inmediatamente, con la ayuda de más personas que aparecieron en el lugar, procedió a arrestarlo civilmente. El arrestado resultó ser el apelante Raúl Hernández Mercado. T.E., págs. 1022–1107.

Mientras todo esto transcurría, Bayonet Tartak fue trasladado en ambulancia al Hospital Pavía en Santurce. Allí fue atendido por varios médicos, incluyendo a su padre el Dr. Natalio Bayonet. Finalmente murió como consecuencia de la herida de bala recibida.

Así las cosas, el 17 de abril de 1987 la agente Laura Príncipe recogió al apelante en el Hogar Juvenil de Humacao para conducirlo al Centro de Investigaciones en Hato Rey, donde se le sometió una querella por la falta de asesinato en primer grado. La agente obtuvo la dirección de los padres del apelante y buscó a su madrastra, la Sra. Leonilda Ortiz, y al hermano mayor para que la acompañaran al mencionado Centro. Después de hacerle las advertencias legales correspondientes, Hernández Mercado informó *que lo que tenía que decir lo diría "con abogado o sin abogado, en cualquier lugar y que sólo quería volver a Humacao".* T.E., págs. 882–883. *Inmediatamente procedió a relatar su confesión de los hechos según antes expuestos.*

Celebrado el juicio por jurado, éste rindió veredicto de culpabilidad en todos los cargos imputados. Luego de celebrada una vista de agravantes, el tribunal (Hon. Crisanta Rodríguez, Juez) sentenció al apelante a cumplir consecutivamente ciento cuarenta y cuatro (144) años de prisión.[1]

---

[1] La distribución de las penas por los delitos que fue convicto el acusado es la siguiente: cinco (5) años de cárcel por la violación al Art. 6 y diez (10) años por la violación

■ De esta sentencia apela Hernández Mercado. Le imputa al tribunal de instancia la comisión de varios errores que, en síntesis, se refieren al impacto de la publicidad excesiva que tuvo el caso en la etapa del *voir dire*, errores en la identificación del apelante y la admisibilidad de una confesión hecha por éste.(2) No le asiste la razón.

## II

En su primer señalamiento, Hernández Mercado sostiene que debido a la publicidad excesiva en la etapa del *voir dire* no tuvo un juicio imparcial.(3) El apelante presentó verbalmente una moción de suspensión de juicio, alegando que habían sido publicados una serie de artículos periodísticos que prejuzgaban al acusado e influenciaban negativamente a los candidatos a jurados. La ilustrada juez del foro de instancia celebró una vista sobre el particular en la cual admitió en evidencia los recortes periodísticos presentados por la defensa.

Después de examinar estas reseñas de la prensa y de escuchar a las partes, el tribunal concluyó que tenía los instrumentos

---

al Art. 8, ambos de la Ley de Armas de Puerto Rico, 25 L.P.R.A. secs. 416 y 418; veinte (20) años por el delito de robo, diez (10) años por el delito de tentativa de robo y noventa y nueve (99) años por el delito de asesinato.

(2) El apelante plantea, además, la comisión de varios errores relacionados con la imposición de agravantes en la sentencia, así como el cumplimiento de las penas en forma consecutiva. De un examen de la transcripción de evidencia entendemos que el foro de instancia actuó correctamente en la imposición de agravantes en conformidad con la Regla 171 de Procedimiento Criminal, 34 L.P.R.A. Ap. II. Los hechos de este caso, según probados, se ajustan por lo menos a los incisos (a), (b), (c) y (d) de la referida regla.

Sobre la imposición de condenas a ser cumplidas consecutivamente, hemos sostenido que descansa en la sana discreción del tribunal. *Pueblo v. González*, 97 D.P.R. 541 (1969); Regla 179 de Procedimiento Criminal, 34 L.P.R.A. Ap. II. Ello no constituye un castigo cruel e inusitado si el juzgador tomó en consideración la naturaleza de los delitos y el hecho de que las penas decretadas caigan dentro de los límites fijados por un estatuto. *Pueblo v. Burgos Hernández*, 113 D.P.R. 834 (1983). Concluimos que el tribunal no abusó de su discreción.

(3) El apelante alega, también, que erró el tribunal a quo al limitarle las preguntas en el *voir dire* y no permitirle indagar sobre la presunción de inocencia. Este señalamiento es inmeritorio. La transcripción de evidencia refleja que el tribunal a quo impartió las instrucciones correspondientes sobre el concepto de presunción de inocencia y otros aspectos jurídicos pertinentes. T.E., págs. 35–37, 80, 228–229, 428–431, 623, 639–640, 649–651 y 824–826.

necesarios para garantizar un juicio imparcial mediante una combinación de un extenso *voir dire*, el aislamiento del Jurado y unas instrucciones específicas.

■ Como sabemos, "el procedimiento de desinsaculación del jurado es una de las etapas más críticas e importantes de un juicio criminal por cuanto el mismo es uno de los mecanismos mediante los cuales se pretende garantizar que el jurado que intervendrá en el proceso como juzgador supremo de los hechos será uno imparcial, capacitado y libre de prejuicios". *Pueblo v. Jiménez Hernández*, 116 D.P.R. 632, 635 (1985). Con el propósito de garantizar que el Jurado seleccionado no haya prejuzgado al acusado, se le reconoce al magistrado que preside el proceso y a los abogados de las partes facultad para interrogar a los candidatos al Jurado para determinar "su capacidad para actuar" con completa imparcialidad. Regla 119(b) de Procedimiento Criminal, 34 L.P.R.A. Ap. II.[4] En esta etapa del caso corresponde al tribunal tomar las medidas necesarias para evitar que la publicidad anterior al juicio y durante el mismo impida un proceso deliberativo fundado únicamente en la prueba vertida en el juicio. Véase, a modo de ejemplo, *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966).

■ Nuestra doctrina parte de la premisa que la publicación de noticias sobre los procedimientos criminales mantiene al público informado sobre asuntos de su interés y que existe un derecho fundamental de la prensa a publicar lo ocurrido en el sistema de justicia criminal. R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. P.R., 1986, Vol. II, págs. 1577–1578; L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, págs. 856–861. Nuestros anteriores pronunciamientos reconocen que la divulgación de noticias sobre un caso de interés para

---

[4] "(b) El tribunal examinará y formulará al jurado las preguntas pertinentes a su capacidad para actuar. El tribunal permitirá a las partes efectuar un examen adicional a los jurados potenciales." 34 L.P.R.A. Ap. II, R. 119(b).

todo el país "no violenta *per se* el derecho constitucional de un acusado, sobre quien recae el peso de la prueba para demostrar afirmativa y satisfactoriamente que las mismas fueron de tal naturaleza, impacto y exposición que le han privado de un juicio ante jurado imparcial". *Pueblo v. Lebrón González*, 113 D.P.R. 81, 86 (1982). Véanse, además: *Pueblo v. Maldonado Dipiní*, 96 D.P.R. 897, 908 (1969); J.R. Cintrón Rodríguez, *Los derechos del acusado y la libertad de prensa*, 56 Rev. Jur. U.P.R. 416 (1987).

▬ No olvidemos que la prensa tiene la responsabilidad de informar al pueblo sobre lo que ocurre en las tres (3) ramas del Gobierno para que el país esté mejor informado del trabajo realizado por todos los servidores públicos, particularmente en lo referente a las investigaciones y al procesamiento de acusados por delitos ocurridos. J. Trías Monge, *Sociedad, Derecho y Justicia*, Río Piedras, Ed. U.P.R., 1986, págs. 320–339. En momentos en que la criminalidad afecta la paz y tranquilidad de todos los puertorriqueños, la prensa cumple una función eminentemente social al divulgar información sobre los casos judiciales. *Pueblo v. Pérez Santaliz*, 105 D.P.R. 10, 14 (1976); E.E. Younger, *Some Thoughts on the Defense of Publicity Cases*, 29 Stan. L. Rev. 591 (1977). Sin embargo, el desempeño de esta función conlleva también ciertas responsabilidades en determinadas circunstancias. En lo referente a los casos criminales, los diversos medios de comunicación deben tener presente los derechos constitucionales de los acusados, particularmente la presunción de inocencia y el derecho a un juicio justo e imparcial. La publicidad excesiva sobre un caso que sea perjudicial al acusado hace más difícil la selección de un Jurado imparcial y la celebración de un juicio justo.

▬ No obstante, corresponde a la Rama Judicial hacer el delicado balance de interés entre la libertad de la prensa y los derechos de los acusados. Véase también, a modo ilustrativo, *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 547–551 (1976). En *Pueblo v. Fournier*, 77 D.P.R. 222, 297 (1954), reconocimos las dificultades inherentes de esta delicada función judicial:

No existen soluciones fáciles en la tarea de proteger tanto la libertad de prensa como el derecho de un acusado a un juicio justo e imparcial. Los dos intereses que en alguna forma deben balancearse han sido descritos por el Juez Frankfurter en su opinión en *Maryland* v. *Baltimore Radio Show, Inc., et al.*, supra, como sigue a la pág. 920: "Una de las exigencias de una sociedad democrática es que el público sepa lo que ocurre en los tribunales mediante información de la prensa de lo que allí ocurre, a fin de que el público pueda juzgar si nuestro sistema de derecho penal es justo y correcto. Por otro lado, nuestra sociedad ha separado la corte y el jurado como el tribunal para determinar la culpabilidad o la inocencia *a base de evidencia presentada en corte*, hasta donde sea humanamente posible." (Énfasis en el original.)

 Aunque la tarea no es fácil, corresponde a los magistrados tomar las medidas necesarias para garantizarle al acusado un juicio justo mediante la selección de las personas que puedan "actuar con *entera imparcialidad y rectitud* en el asunto que a ella[s] haya de someterse". (Énfasis suplido.) Regla 121(e) de Procedimiento Criminal, 34 L.P.R.A. Ap. II. Como se espera que el Jurado rinda un veredicto a base de la prueba sometida en el juicio, la publicidad adversa anterior al juicio tiene particular relevancia, pues puede afectar la objetividad de los jurados. Los tribunales tienen los poderes y los instrumentos necesarios para seleccionar los candidatos idóneos y minimizar los efectos adversos de la publicidad anterior al juicio. *Chandler v. Florida*, 449 U.S. 560 (1981); *Murphy v. Florida*, 421 U.S. 794 (1975); *United States v. Faul*, 748 F.2d 1204 (8vo Cir. 1984). Véase, también, *Report of the Committee on the Operation of the Jury System on the "Free Press–Fair Trial" Issue*, 38 Rev. Jur. U.P.R. 385 (1968).

 Entre estas medidas, los magistrados pueden llevar a cabo un *voir dire* extenso y riguroso que le permita indagar sobre la exposición que han tenido los candidatos a información periodística y la naturaleza de los datos obtenidos a través de las noticias. Esto permite a los jueces examinar cuidadosamente el efecto de la publicidad sobre cada uno de los candidatos al Jurado y recusar a los que advienen con una opinión formada.

■ En estos casos de notoriedad el tribunal también tiene el poder inherente de otorgar recusaciones perentorias adicionales a las provistas en la Regla 123 de Procedimiento Criminal, 34 L.P.R.A. Ap. II. Véase, como ejemplo, *United States v. Capo*, 595 F.2d 1086 (5to Cir. 1979).

■ Una vez se selecciona el Jurado, el tribunal también puede aislarlo o "secuestrarlo" para evitar su exposición a la publicidad adversa u otro tipo de presiones que causen un perjuicio sustancial al acusado. Véanse: *Gannett Co. v. DePasquale*, 443 U.S. 368, 379 (1979); *United States v. Greer*, 806 F.2d 556, 557–558 (5to Cir. 1986); *United States v. Kimberlin*, 805 F.2d 210, 224 (7mo Cir. 1986). El tribunal tiene amplio poder discrecional para aplicar esta medida en casos extremos y así garantizar el derecho del acusado a un juicio justo e imparcial. Debido a que esta es una medida que conlleva sacrificio individual directo sobre los miembros del Jurado y que, además, incidentalmente tiene unas consecuencias fiscales sobre el sistema judicial, estamos ante una decisión de carácter extraordinario.

■ Por último, en estos casos es aconsejable que los jueces impartan instrucciones cuidadosas y exhaustivas sobre la responsabilidad de rendir un veredicto fundado en la prueba vertida durante el juicio sin tomar en consideración la información obtenida de otras fuentes, particularmente de la publicidad adversa al acusado. Véanse: F.C. Sullivan, *Criminal Trial Procedure*, 43 La. L. Rev. 375, 396–400 (1982); D.R. Fretz, *Courts and the News Media*, Nacional College of the State Judiciary, University of Nevada, 1977, pág. 30.

■ En casos extremos en los cuales no sea posible utilizar efectivamente estos instrumentos para garantizar un juicio justo, el tribunal puede suspender los procedimientos al amparo de la Regla 109 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, o puede ordenar el traslado a otra Sala. Véanse: *Sheppard v. Maxwell*, supra; *Estes v. Texas*, 381 U.S. 532 (1965); *Irvin v. Dowd*, 366 U.S. 717 (1961).

## III

Expuesta la normativa, analicemos inicialmente si los artículos periodísticos admitidos en evidencia contienen publicidad nociva al acusado. El apelante presentó en evidencia ocho (8) artículos noticiosos publicados entre las fechas de 6 de septiembre a 16 de septiembre de 1987. Para una comprensión de estos artículos examinemos objetivamente su contenido.

Domingo 6 de septiembre de 1987 — *El Nuevo Día*. *"Otra vez tras las rejas."* Esta reseña contiene una foto del apelante y describe básicamente las alegadas imputaciones sobre la comisión de unos delitos mientras se encontraba en libertad condicional.

Lunes 7 de septiembre de 1987 — *El Vocero de Puerto Rico*. *"Matador Confeso de 'Talito' Bayonet asalta colmado cerca de su casa."* Esta reseña contiene una foto del apelante y habla sobre la confesión prestada por éste, las alegadas imputaciones de delitos, así como los hechos que fueron objeto de la prueba presentada por el Ministerio Público durante el juicio. También señala que al apelante se le renunció a su jurisdicción.

Miércoles 9 de septiembre de 1987 *El Vocero de Puerto Rico*. — *"Al matador de 'Talito' Bayonet, acusado de nuevo por robo armado."* Contiene una foto del apelante y una reseña de una alegada determinación de causa probable contra el apelante por el delito de robo, posterior a los hechos de este caso. Esta noticia en particular utiliza los calificativos "peligroso asesino confeso" y "criminal empedernido" alusivos al apelante.

Jueves 10 de septiembre de 1987 — *El Nuevo Día*. *"A juicio el matador de 'Talito'."* Contiene foto del apelante y reseña sobre la vinculación de éste con unos robos, asesinatos y la confesión prestada por él, los hechos del caso y su adicción a la cocaína.

Viernes 11 de septiembre de 1987 — *The San Juan Star*. *"Selection of Jury begins in teen's trial for murder."* Aparte de describir el inicio del *voir dire*, el resto de la noticia sólo expone los hechos del caso y la supuesta vinculación del apelante con otros hechos delictivos.

Viernes 11 de septiembre de 1987 — *El Nuevo Día*. *"Escogen al jurado en el caso de Bayonet Tartak."* Contiene la foto del

apelante y básicamente reseña incidentes relacionados al *voir dire*.

Miércoles 16 de septiembre de 1987 — *El Vocero de Puerto Rico*. *"Juicio caso Bayonet Tartak, Inician prueba cargo al asesino."* Contiene la foto del apelante solicitando la supresión de su confesión. También incluye el calificativo de "asesino confeso" y la supuesta vinculación del apelante con una ganga de asaltantes de Bayamón. Por último, contiene información sobre el inicio de la prueba de cargo por parte del Fiscal.

Miércoles 16 de septiembre de 1987 — *El Nuevo Día*. *"Eligen el jurado en el juicio contra el matador de 'Talito' Bayonet."* Contiene la foto del apelante y describe el tiempo que duró el *voir dire*. Incluye información sobre la vinculación del apelante con la muerte de otro hombre y con robos en el área de Guaynabo.

Al examinar los referidos escritos encontramos que éstos presentan unas características particulares tanto en sus titulares como en su contenido. Algunas reseñas contienen información divulgada con anterioridad al juicio y relacionada con la confesión prestada por el apelante y su adicción a la cocaína. Otros reseñan unos alegados delitos cometidos por el apelante mientras se encontraba en libertad condicional. Por otro lado, algunas de las noticias incluyen información sobre el procedimiento judicial y hacen referencia a los hechos que resultaron ser la prueba que prestó el Ministerio Público. A nivel del titular o la presentación de la noticia, la mayoría utilizó la foto del apelante con algunos calificativos para describirlo.

De los ocho (8) artículos sometidos, cuatro (4) describen incidentes ocurridos durante el juicio, entre el 10 y el 16 de septiembre, relacionados con la selección del Jurado y la prueba de cargo presentada. Los otros artículos se refieren a incidentes anteriores al juicio relacionados con otras acusaciones contra Hernández Mercado por hechos acaecidos en un asalto a un colmado. Aunque tres (3) de las reseñas contienen titulares y calificativos de corte sensacionalista (*El Vocero de Puerto Rico*, 7 y 9 de septiembre de 1987; *El Nuevo Día*, 10 de septiembre de 1987) alusivos a su vinculación con la muerte de Bayonet Tartak,

el apelante no ha demostrado satisfactoriamente que los mismos afectaron la imparcialidad del Jurado.

De la transcripción de la evidencia surge que durante la selección se utilizaron cuatro (4) paneles y que el tribunal tomó todas las medidas correspondientes para garantizar que el Jurado no hubiese prejuzgado al acusado. Con este propósito, y *según acordado con las partes*, el tribunal celebró un *voir dire* riguroso a cada uno de los candidatos (T.E., pág. 5) y los interrogó extensamente para determinar si tenían una opinión formada a base de la publicidad del caso. A manera de ejemplo, a cada miembro la juez le hizo la pregunta siguiente:

HON. JUEZ:

Bien. Don Luis, el viernes cuando yo les di las instrucciones, no perdón, antes de eso cuando yo les leí las acusaciones, yo les pregunté a usted y a sus compañeros de panel si tenían algún conocimiento sobre los hechos de este caso, usted fue una de las personas que levantó su mano, lo que quisiéramos es que usted nos dijera ¿qué le viene a su recuerdo, qué le viene a su mente que usted sepa sobre este caso, sobre el señor acusado, porque lo haya leído en la prensa, lo haya escuchado en las noticias, o lo haya escuchado de alguna otra persona? T.E., pág. 609.

Por su parte, el abogado de la defensa también tuvo amplia oportunidad para interrogar a todos los candidatos e indagar sobre el conocimiento previo que tenían del caso y el efecto de la publicidad sobre su capacidad para juzgar imparcialmente:

LCDO. AGRAIT:

P— Usted dice que ha leído algunas cosas sobre este caso. Y yo le pregunto, una de las cosas que usted le señalaba a la Honorable Juez, es que, que esto había sucedido en Isla Verde ¿Usted recuerda que usted lo dijo?

[JURADO:]

R— Yo lo que me acuerdo que yo leí . . .
P— Ajá.
R— Eso es lo que más yo me acuerdo con . . .
P— [¿]*Usted recuerda en qué lugar en Isla Verde dicen los periódicos que había ocurrido*?

R— En, yo creo que fue, sí me estoy, porque me acuerdo que fue en la marginal de . . .

P— Y entonces usted le señaló al Tribunal *que leyó* que una persona había matado a otra persona. [¿]Usted recuerda si en esa información que usted leyó, decía cómo habían matado a esa persona?

R— Bien específico, este, no.

P— Y de lo poco específico, [¿]qué recuerda, que lo habían matado, o no recuerda ningún otro detalle[?]

R— Que, cuando la persecución que hubo, nada más.

P— De lo más que se acuerde de lo que decía en la persecución.

P— ¿Y qué pensó usted después *que leyó* de la persecución?

R— Eso es una cosa que uno lo lee y más bien no piensa en nada. Mucha gente, una persona puede hacer con otro, ese tipo a lo mejor andaba con algo, son muchas las preguntas que uno se puede hacer. (Énfasis suplido.) T.E., pág. 535.

En distintos momentos del *voir dire* el tribunal impartió instrucciones sobre el hecho de que los jurados no podían tener prejuicio contra el acusado por la publicidad recibida. T.E., pág. 623. No obstante, una vez seleccionado el Jurado, el tribunal instruyó a sus miembros de que no podían "considerar ni dejarse influir por ninguna información, comentario u opinión" que escucharan o que hubieran escuchado "en relación a la prueba y a los hechos de este caso, ni tampoco de ninguna información" que hubiera sido difundida "por los distintos medios" noticiosos del país. T.E., págs. 874–875.

Para proveer mayores garantías al acusado, a petición de la defensa, el tribunal ordenó el secuestro del Jurado para asegurar que no tuviera acceso a la información publicada en los periódicos (relacionada con los incidentes del caso) ni pudiera "oír ningún tipo de noticia, televisada ni por radio" ni recibir correspondencia que no fuera previamente inspeccionada por los alguaciles. T.E., págs. 983–984. También requirió a los alguaciles que supervisaran cuidadosamente todas las comunicaciones de otras personas con los miembros del Jurado, incluso las conversaciones telefónicas. T.E., págs. 984–985.

Por último, en sus instrucciones finales al Jurado, el tribunal recalcó su deber de rendir un veredicto fundado únicamente en la

prueba dirimida en el juicio y les recordó que no podían considerar las informaciones publicadas sobre el arresto y encausamiento de Hernández Mercado:

> Ustedes deberán descartar totalmente y no considerar cualquier informe de prensa, televisión o radio que puedan haber leído, visto o escuchado. Tales informes no constituyen evidencia y por lo tanto ustedes no pueden considerar ni dejarse influenciar en manera alguna por tal[es] publicaciones. *Ello resulta altamente impropio, por lo que les instruyo a que se abstengan de cualquier discusión ulterior sobre el particular. Es irrazonable considerar tales informes por la misma circunstancia de que no constituya prueba, toda vez que no ha habido oportunidad de constatar o comprobar su certeza o de alguna manera explicarlo.* (Énfasis suplido.) T.E., pág. 1238.

Este conjunto de medidas cautelares adoptadas por el tribunal fueron altamente confiables. La defensa tuvo una extensa participación en el proceso de selección del Jurado y a través del juicio el tribunal tomó todas las medidas necesarias para garantizar un juicio justo sin menoscabar los derechos de la prensa. En estas circunstancias, no era necesario suspender los procedimientos o tomar medidas extremas para proteger los derechos del acusado.

## IV

En los señalamientos de error siguientes el apelante argumenta que su confesión no fue libre y voluntaria y que el Ministerio Público no presentó prueba independiente de corroboración. Tampoco se cometieron estos errores.

La agente Laura Príncipe declaró, en síntesis, que para el viernes 17 de abril de 1987 era agente de la división de Ayuda Juvenil del Cuerpo de Investigaciones Criminales. En esa fecha se le ordenó buscar al acusado en el Hogar Juvenil de Humacao y traerlo a la Sala de Investigaciones del Centro Judicial de Hato Rey.

Una vez allí, el Procurador para Asuntos de Menores le solicitó a la agente que se dirigiera a la barriada Vietnam, en

Cataño, para buscar a los padres del menor. Se personó al lugar y condujo a la madrastra y al hermano del menor a la Sala de Investigaciones. T.E., pág. 880. El menor se comunicó con su madrastra, hablaron unos minutos y luego la agente procedió a hacerle las advertencias legales que consistieron en que tenía derecho a "no declarar" y a guardar silencio, que tenía "derecho a un abogado" y del deber de "conseguirle uno libre de costos". T.E., págs. 881–882.

Se refleja claramente, a la luz de este testimonio, que las advertencias fueron explicadas detallada y detenidamente y que no hubo intimidación. La agente le preguntó al menor si entendía las advertencias y éste contestó que "lo que tengo que decir, lo digo aquí o donde quiera". T.E., pág. 882. Tanto el menor como su madrastra firmaron el documento que refleja que se les hicieron las advertencias. T.E., pág. 881.

 A los menores les protege en todo momento la garantía constitucional contra la autoincriminación. *R.A.M. v. Tribunal Superior*, 102 D.P.R. 270, 273 (1974). Para determinar si un acusado renunció libremente a su derecho a no incriminarse, hemos señalado reiteradamente que la renuncia tiene que ser libre y voluntaria a la luz de la totalidad de las circunstancias. *Pueblo v. Ramos y Álvarez*, 122 D.P.R. 287 (1988); *Pueblo v. Pellot Pérez*, 121 D.P.R. 791 (1988). En el caso particular de los menores, la voluntariedad se define no sólo en el sentido de que el menor no haya sido coaccionado o sugestionado, sino a base de que la renuncia no sea el resultado de la ignorancia de sus derechos o de la fantasía, el pavor o el desaliento del adolescente. *Pueblo en interés menor J.A.B.C.*, 123 D.P.R. 551 (1989).

A la luz de la totalidad de las circunstancias particulares de este caso concluimos, al igual que concluyó la juez de instancia, que el menor renunció libre y voluntariamente a su derecho a no incriminarse. Se le explicó clara y detenidamente los derechos que tenía, se buscó a sus familiares y se le permitió reunirse con ellos. El ambiente no era de coacción física ni sicológica. T.E., págs. 880, 883, 899, 996 y 1127–1130. Finalmente, el menor y su madrastra

firmaron el documento que contiene las advertencias legales. Este procedimiento no sólo cumplió con las garantías constitucionales sino, además, con las disposiciones de la Ley de Menores de Puerto Rico.(6)

▆▆▆ Sobre la necesidad de prueba de corroboración independiente a una confesión, la doctrina prevaleciente hasta ahora es la del *corpus delicti* . Su propósito es evitar que el acusado sea juzgado a base de confesiones o admisiones que pudieran resultar falsas. Véase *Pueblo v. Fradera Olmo*, 122 D.P.R. 67 (1988). Al amparo de esta normativa se requiere que las confesiones o admisiones hechas por el acusado sean corroboradas con prueba *aliunde* e independiente que tienda a establecer el *corpus delicti*. Hemos definido esa prueba como aquella que demuestre que *se ha sufrido una pérdida o daño específico y que dicho daño o pérdida específica fue ocasionada por un agente criminal. Pueblo v. Hernández*, 75 D.P.R. 907, 915 (1954); *Pueblo v. Fradera Olmo*, supra.

▆▆▆ En cuanto a los elementos esenciales admitidos por el acusado, éstos pueden ser corroborados con prueba circunstancial de tal forma que se pueda justificar la veracidad otorgada a esa prueba por un Jurado. *Pueblo v. Campos Suárez*, 86 D.P.R. 310, 316 (1962); *Pueblo v. Fradera Olmo*, supra.

La prueba independiente en este caso consistió en que vieron al acusado hablando con Bayonet Tartak y luego éste caer al suelo herido. Testimonio de Efraín López Leván, T.E., págs. 954–956. La testigo Norma Tartak de Bayonet, madre del occiso, testificó que oyó un "estruendo bien grande" y luego vio a su hijo en cuclillas y herido de bala en el hombro. T.E., págs. 913–947. El

---

(6) El Art. 11 de la Ley de Menores de Puerto Rico, Ley Núm. 88 de 9 de julio de 1986, dispone:

"*Renuncia de derechos*

"No se admitirá la renuncia del menor a cualquier derecho constitucional que le cobije si no están presentes sus padres o encargados y su abogado y sin una determinación del Juez que ésta es libre, inteligente y que el menor conoce las consecuencias de la renuncia. No obstante, la presencia del abogado no será requerida para renunciar al derecho de asistencia de abogado." 34 L.P.R.A. sec. 2211.

testigo Natalio Bayonet, padre del occiso, testificó sobre el estado físico de su hijo, así como la identificación de su cadáver posteriormente. T.E., págs. 1007–1021.

Los testimonios de Juan Ramón Pérez Pérez y de Carmen Milagros Lucca Colón son importantes, ya que establecen que al momento de ser víctimas del robo de su auto el apelante les dijo: *"bájate del carro o te voy a pegar otro tiro a t[i], como a él."* T.E., pág. 1080. También testificaron que vieron al apelante con un arma en su mano y que oyeron una detonación. T.E. págs. 1022–1107.

█ Nótese que a la luz de los criterios de la doctrina del *corpus delicti* hay prueba independiente conducente a establecer la muerte de Bayonet Tartak y que ésta se produjo mientras el apelante se acercaba a robarle. El Jurado, con esa prueba circunstancial, pudo inferir razonablemente que si los testigos hubiesen mostrado resistencia al robo del vehículo, como la mostró Bayonet Tartak,[7] habrían recibido un balazo. También hay suficiente prueba circunstancial independiente que el Jurado aquilató y consideró sustancial para establecer el daño ocasionado y que el mismo fue producto de una agencia criminal. Además, toda la prueba ofrecida, a su vez, era admisible y fue debidamente admitida. Cumplidos todos los requisitos y evaluada la totalidad de las circunstancias, concluimos que hay suficiente prueba extrínseca para sostener las convicciones. Como hemos manifestado anteriormente, un tribunal apelativo no debe revocar una convicción a base de un planteamiento de insuficiencia de prueba que se reduce a la credibilidad de testigos, en ausencia de indicios de prejuicio, parcialidad o error manifiesto. El juzgador de instancia está en mejor posición al respecto. *Pueblo v. Acabá Raíces*, 118 D.P.R. 369 (1987).

---

[7] El apelante señaló en su confesión que se acercó a la víctima y le dijo "esto es un asalto". Procedió la víctima a darle una patada en la mano izquierda y en el pecho. En esos momentos el apelante le disparó con el revólver. T.E. pág. 884.

# V

■ Como último señalamiento de error, el apelante plantea que erró el tribunal a quo al admitir en evidencia el testimonio del Sr. Juan Pérez Pérez.[8] Sostiene la defensa que ese testimonio era de poco valor probatorio en comparación con el potencial perjuicio que le causaría al acusado.

El testimonio objetado consistía en una descripción del robo de que fueron víctimas tanto el testigo como su novia, momentos después del asesinato de Bayonet Tartak. En el relato, el testigo también habló sobre la persecución que le hizo al apelante posteriormente. La juez de instancia celebró una vista, en ausencia del Jurado, y determinó que por existir elementos de la identificación del apelante ameritaba que los señores del Jurado escucharan el testimonio.

■ Recientemente, en *Pueblo v. Ortiz Pérez*, 123 D.P.R. 216 (1989), analizamos el alcance de la Regla 19 de Evidencia, 32 L.P.R.A. Ap. IV,[9] y concluimos que constituye una regla que excluye prueba de poco valor probatorio. También afirmamos que el "perjuicio indebido" como causal de exclusión de evidencia pertinente se refería a prueba que podía conducir a un resultado erróneo, apelando a los sentimientos y a la emoción. *Pueblo v. Ortiz Pérez*, supra. Especialmente se trata de prueba grotesca e

---

[8] También señala como error la negativa del ilustrado foro de instancia para suprimir la identificación hecha por la testigo Carmen Milagros Lucca en una rueda de detenidos. Alega que el procedimiento fue altamente sugestivo debido a que el apelante era el único miembro en la rueda que vestía ropas claras. Este señalamiento es totalmente inmeritorio. Encontramos que en la rueda de detenidos había más testigos con ropas claras (T.E., pág. 1105), además, en su comparecencia ante nos el propio apelante admite que la similitud en la vestimenta no es mandatoria en una rueda de detenidos. *Pueblo v. De Jesús Rivera*, 113 D.P.R. 817, 822–823 (1983).

[9] *"Regla 19. Evidencia pertinente excluida*
"Evidencia pertinente puede ser excluida cuando su valor probatorio es de poca significación en relación a cualesquiera de estos factores:
"(a) Peligro de causar perjuicio indebido
"(b) probabilidad de confusión
"(c) desorientación del jurado
"(d) dilación de los procedimientos
"(e) innecesaria presentación de prueba acumulativa." 32 L.P.R.A. Ap. IV.

inflamatoria que exalta el ánimo y las emociones de un Jurado. E.W. Cleary, *McCormick on Evidence*, 3ra ed., Minnesota, Ed. West Publishing Co., 1984, Sec. 185, pág. 439.

De un examen de la narración hecha por el testigo, no encontramos que la prueba aportada sea aquella que deba ser excluida por el juzgador por causar perjuicio indebido. No erró el tribunal a quo al admitir esa prueba y ordenar que pasara a ser evaluada por los miembros del Jurado.

Por todos los fundamentos antes expuestos, *se confirman las sentencias apeladas.*

El Juez Asociado Señor Rebollo López no intervino.