EL PUEBLO DE PUERTO RICO, demandante y recurrido, *v.* RICARDO MOLINARI SUCH, demandado y peticionario.

*Número:* CE-94-837    *Resuelto:* 5 de diciembre de 1994

*Joaquín Monserrate Matienzo*, abogado del peticionario; *Pedro A. Delgado Hernández, Procurador General*, y *Ricardo E. Alegría Pons, Procurador General Auxiliar*, abogados del El Pueblo.

## SENTENCIA

## I

El Ministerio Fiscal presentó dos (2) pliegos acusatorios contra Ricardo Molinari Such por hechos alegadamente ocurridos el 25 de junio de 1994 en un accidente vehicular, mientras conducía en estado de embriaguez. Como consecuencia de éste, resultó muerto el niño Julio Antonio Arroyo y, posteriormente, su madre, la Lcda. Lilliam Alfonso Nogales. Art. 87 del Código Penal, 33 L.P.R.A. sec. 4006;(1) Secs. 5-801 y 3-301 de la Ley de Vehículos de Tránsito de Puerto Rico, 9 L.P.R.A. secs. 1041 y 721.

El 21 de septiembre de 1994 el Tribunal Superior, Sala de San Juan (Hon. Miguel Rivera Arroyo, Juez), señaló el juicio para el 15 de noviembre de 1994. Mientras tanto, como parte de la campaña del referéndum de enmiendas constitucionales que se celebraría en la Isla el 6 de noviembre, el 27 de octubre comenzó a difundirse por televisión un anuncio cuyas imágenes y sonidos aludían (frenazo y mano) al caso en controversia, acompañadas de las siguientes palabras del locutor:

> Un accidente puede cegarle la vida a cualquiera, *al culpable* le esperaría la cárcel, pero si es amigo de Rosselló, *la justicia es diferente.*
> De Fortaleza vienen a sacarlo del lío, el superintendente puede declarar negligente a la víctima, se olvidan las pruebas

---

(1) Dispone:

"Cuando en la muerte ocasionada por una persona al conducir un vehículo de motor mediare imprudencia crasa o temeraria, se impondrá pena de reclusión por un término fijo de tres (3) años. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de cinco (5) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de dos (2) años.

"La imprudencia crasa o temeraria es aquella de tal naturaleza que demuestre un absoluto menosprecio de la seguridad de los demás bajo circunstancias que probablemente produzcan daños a éstos y no significa una mera falta de cuidado." 33 L.P.R.A. sec. 4006.

de alcohol. *Al rico lo protegen sus influencias, al pobre sólo tiene sus derechos* ....

¡Cuidado! Al que abusa del poder no se le puede dar más poder. (Énfasis suplido.) Solicitud de *certiorari*, pág. 6.

Cuatro (4) días después, el acusado Molinari Such solicitó con urgencia una vista para dilucidar si debía ordenarse el cese del anuncio, pues entendía que su difusión le negaba sus derechos a la presunción de inocencia y a gozar de un juicio justo e imparcial. Una vez celebrada, el tribunal de instancia rehusó paralizar dicho anuncio y declaró sin lugar la suspensión.

Así las cosas, el 15 de noviembre la defensa pidió de nuevo la posposición del juicio. El tribunal reiteró su negativa, sin menoscabo de volver a considerar ese pedido en una etapa más adelantada. Comenzó, pues, el proceso de desinsacular al Jurado. Suscintamente, a modo ilustrativo, uno (1) de los candidatos expresó que no se sentiría tranquilo si lo juzgara alguien en el estado de ánimo que él se encontraba; otro que era mejor que juzgara al acusado alguien sin idea preconcebida de los hechos; una jurado indicó que le gustaría ser parte de la historia y que si la defensa la convencía, ella absolvía. En términos similares se expresó un candidato, quien manifestó que al oír el anuncio tuvo la idea de que el acusado era culpable y tendría que presentar pruebas que demostraran lo contrario. Por su parte, otra dijo que requeriría que el acusado probara algo distinto a lo que había escuchado.

Terminado el interrogatorio del octavo jurado potencial, el tribunal reafirmó en términos *finales* su negativa a suspender. Consignó que las contestaciones de los candidatos " 'no revelaban el tipo de prejuicio que viola los derechos constitucionales del acusado a tener un juicio justo e imparcial' ". *Certiorari*, pág. 10. Además, expresó que " 'el resultado sería igual ... si lo suspendo para dentro de dos semanas o dos meses' ". Íd. De ese dictamen aflora diáfanamente que su negativa a posponer el caso fue firme, no empece haber escuchado algunas expresiones susceptibles

de ser interpretadas como que denotaban que no se encontraban en posición de emitir un criterio imparcial, fundamentado únicamente en la prueba que se desfilara.

## II

■ La publicación y difusión de noticias o anuncios, en torno a hechos que sean objeto de un proceso judicial, no redundan automáticamente en una violación per se al derecho a un juicio justo e imparcial. Sobre el acusado " 'recae el peso de la prueba para demostrar afirmativa y satisfactoriamente que los mismos fueron de tal naturaleza, impacto y exposición que le han privado de un juicio ante jurado imparcial' ". *Pueblo v. Hernández Mercado*, 126 D.P.R. 427, 436 (1990), citado con aprobación en *Pueblo v. Moreno Morales II*, 132 D.P.R. 290 (1992). Véanse, además: *Pueblo v. Miranda Santiago*, 130 D.P.R. 507 (1992); *Pueblo v. Lebrón González*, 113 D.P.R. 81, 86 (1982); *Pueblo v. Maldonado Dipiní*, 96 D.P.R. 897, 908 (1969).

■ Corresponde a los jueces de instancia usar con discreción y prudencia los mecanismos disponibles para "garantizarle al acusado un juicio justo mediante la selección de las personas que puedan 'actuar con entera imparcialidad y rectitud en los asuntos que han de someterse' ... y ... para seleccionar los candidatos idóneos y minimizar los efectos adversos de la publicidad anterior al juicio". (Énfasis y citas omitidos.) *Pueblo v. Hernández Mercado*, supra, pág. 437. Dichas medidas incluyen un *voir dire* extenso y riguroso; la concesión de recusaciones perentorias adicionales; el aislamiento o secuestro del Jurado, e impartir unas instrucciones al Jurado sobre su responsabilidad de rendir un veredicto fundamentado exclusivamente en la prueba vertida durante el juicio.

■ *Únicamente* "[e]n casos extremos en los cuales no sea posible utilizar efectivamente estos instrumentos para garantizar un juicio justo, el tribunal puede suspender los

procedimientos al amparo de la Regla 109 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, o puede ordenar el traslado a otra Sala". *Pueblo v. Hernández Mercado*, supra, pág. 439.

### III

En el caso de autos, la publicidad generada, epitomada y exacerbada por el anuncio político pagado, aunque no impide, *dificulta en este momento* la selección de un panel de jurado con un criterio justo e imparcial fundamentado *solamente* en la evidencia; situación excepcional, pues estamos ante un caso *extremo* que requiere prudencialmente la posposición del juicio. Nos explicamos.

Al analizar las contestaciones de los candidatos notamos que, si bien constituyen un número limitado, componen una *muestra* que contiene un fuerte indicador del clima adverso creado que *subsiste al presente*. Aunque en casos anteriores nos habíamos enfrentado a situaciones que habían generado gran publicidad, éstas no eran de igual naturaleza, esto es, de origen político-partidista en un proceso electoral. Ello presenta unas peculiaridades que lo distinguen.

Al natural interés público y numerosas noticias que el accidente generó en la prensa se unió, como tema de oposición a la propuesta enmienda al derecho a la fianza del referéndum,[2] el anuncio político-partidista antes referido, de amplia, repetida y concentrada exposición en las estaciones de televisión del país, que denunciaba como *culpable* al acusado y expresaba que éste había recibido ventajas por ser amigo o conocido del actual Gobernador y ejercer influencia económica.

No podemos abstraernos de que dicho anuncio —al cual

---

[2] No nos corresponde determinar el grado de persuasión y efectividad del anuncio. Tomamos conocimiento judicial de que la enmienda propuesta a la fianza fue descartada mediante el voto, contra más de setecientos mil (700,000) electores.

estuvieron expuestos los candidatos a jurados— se desarrolló en el contexto de una campaña de referéndum para considerar unas enmiendas constitucionales de gran interés para la ciudadanía imbuida del natural apasionamiento, efervescencia emocional e incluso fanatismo. Ello ha colocado al acusado Molinari Such en una posición muy vulnerable, pues su imagen se vio matizada por los tintes político-partidistas de un proceso eleccionario muy reciente, *que todavía es objeto de discusión y artículos en la prensa y los medios noticiosos del país.*

Si bien de ordinario no intervenimos con el criterio de los tribunales de instancia, en el caso de autos concluimos que el tribunal no aquilató en toda su magnitud el impacto *temporero* causado por la publicidad adversa en los potenciales jurados. Aunque respetable, no podemos concurrir con su criterio de que inexorablemente el estado mental de los candidatos será el mismo ahora y después. A base de la muestra que tuvo ante sí, lo correcto hubiese sido concluir que resultaba muy difícil reunir un Jurado imparcial *en ese momento* y no, como lo hizo, entender que la situación no variaría aún suspendiéndolo para finales "de enero o febrero" (Minuta).

En estas circunstancias peculiares —para salvaguardar los derechos constitucionales del acusado Molinari Such a la presunción de inocencia y a un juicio justo e imparcial— concluimos que prudencialmente debemos posponer el juicio por un período de tiempo razonable, en cuyo devenir disminuya la intensidad de la discusión política que aún permea el ambiente puertorriqueño. De esta manera también atendemos con prontitud el reclamo del acusado y tomamos las medidas cautelares necesarias para garantizarle un juicio justo e imparcial. Ante la proximidad de la época navideña, es razonable esperar que se diluya ese elemento en la atención y controversia del caso. En vista de que en esa época los tribunales reducen su actividad por

razón del alto número de días feriados, consideramos razonable posponerlo, como término mínimo, hasta una fecha no anterior al 31 de enero de 1995.

*Se expide el auto y se dicta sentencia conforme lo expuesto.*

Lo pronunció, manda el Tribunal y certifica el señor Secretario General. El Juez Asociado Señor Rebollo López emitió una opinión concurrente. El Juez Asociado Señor Fuster Berlingeri concurrió con el resultado sin opinión escrita.

(*Fdo.*) Francisco R. Agrait Lladó
*Secretario General*

— O —

Opinión concurrente emitida por el Juez Asociado Señor Rebollo López.

Uno de los *graves males* que aqueja al sistema judicial puertorriqueño lo es, sin duda, las *continuas e injustificadas suspensiones* de los señalamientos de juicio a nivel de los tribunales de instancia; situación que causa no sólo incomodidad, e inconveniencias, a los ciudadanos citados para dichos señalamientos, los cuales se ven obligados a comparecer al tribunal una y otra vez, sino que una innecesaria erogación de fondos públicos. *Ello no obstante*, y dada la peculiar situación de hechos del presente caso, *concurrimos con el resultado* a que llega el Tribunal en el mismo; esto es, que procede la *suspensión* del juicio que contra Ricardo Molinari Such actualmente se celebra ante el Tribunal Superior de Puerto Rico, Sala de San Juan.

Consideramos necesario, sin embargo, expresarnos por separado. Ello lo hacemos, entre otras razones, con la esperanza de que nuestras palabras, de alguna forma, ayuden a evitar que en el futuro se vuelva a repetir la situa-

ción de derecho planteada hoy ante nuestra consideración; esto es, la necesidad de la suspensión de un proceso criminal debido a que un partido político inexplicablemente entendió procedente, *con el único propósito de adelantar sus objetivos políticos*, difundir un anuncio que afecta, *de manera sustancial*, no sólo los derechos de un ciudadano que ha sido traído ante los tribunales del País para responder de la supuesta comisión de un delito público, sino la calidad de vida que debe imperar en nuestra sociedad.

## I

En horas de la madrugada del día 25 de junio de 1994 —y en la intersección que forman la carretera 177 con el "acceso" de la carretera 52, las cuales son vías públicas, y en jurisdicción de Río Piedras, San Juan, Puerto Rico— ocurrió un trágico y lamentable accidente entre un automóvil marca Chrysler, modelo 1988, conducido por Ricardo Molinari Such y un auto Pontiac, modelo 1994, conducido por la Sra. Lilliam Alfonso Nogales.

Como consecuencia de dicho accidente murió, en el acto, el joven Julio Antonio Arroyo Alfonso, hijo de la señora Alfonso Nogales y quien viajaba, como pasajero, en el automóvil Pontiac que ésta conducía. Varios días más tarde, y como resultado directo de las heridas sufridas en el referido accidente, falleció la señora Alfonso Nogales. En adición, en dicho accidente resultó herido el conductor Molinari Such. Esa misma noche, y aproximadamente dos (2) horas más tarde de la ocurrencia del accidente, la Policía de Puerto Rico sometió a Molinari Such a un análisis químico de aliento, arrojando el mismo un resultado de "0.10 centésimas de uno por ciento de alcohol en [su organismo]". *Certiorari*, pág. 2.[1]

_____

[1] Véase el pliego acusatorio radicado por el Ministerio Fiscal en relación con una alegada infracción a la Sec. 5-801 de la Ley de Vehículos y Tránsito de Puerto Rico, 9 L.P.R.A. sec. 1041.

Luego de celebrada la correspondiente vista para determinación de causa probable para arresto y la vista preliminar que establece la Regla 23 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, el Ministerio Fiscal radicó dos (2) pliegos acusatorios ante el Tribunal Superior de Puerto Rico, Sala de San Juan, mediante los cuales le imputó a Ricardo Molinari Such dos (2) cargos por infracción al Art. 87 del vigente Código Penal de Puerto Rico, 33 L.P.R.A. sec. 4006, el cual es delito grave.[2] En dichos pliegos acusatorios se alegó por el Estado, como hechos constitutivos de la "imprudencia crasa y temeraria" que requiere la citada disposición legal, que Molinari Such, al momento del accidente, conducía el automóvil en estado de embriaguez, a una velocidad mayor que la permitida por ley y sin llevar encendidas las luces delanteras del vehículo.[3]

El acto de lectura de acusación se llevó a efecto el día 24 de agosto de 1994. En dicho día, el magistrado que presidía los procedimientos en ese momento, en sustitución del juez regular de la sala a la cual estaba asignado el caso, denegó una solicitud de posposición del "señalamiento automático de juicio" que se había realizado a nivel de vista preliminar,[4] predicada la misma en que en dicha fecha, 21 de

---

[2] Establece el citado Art. 87 del Código Penal, 33 L.P.R.A. sec. 4006, que:

"Cuando en la muerte ocasionada por una persona al conducir un vehículo de motor mediare imprudencia crasa o temeraria, se impondrá pena de reclusión por un término fijo de tres (3) años. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de cinco (5) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de dos (2) años.

"La imprudencia crasa o temeraria es aquella de tal naturaleza que demuestre un absoluto menosprecio de la seguridad de los demás bajo circunstancias que probablemente produzcan daños a éstos y no significa una mera falta de cuidado."

[3] Debe señalarse que el Estado, en adición, radicó dos (2) pliegos acusatorios adicionales contra Molinari Such, a saber: uno por una alegada infracción a la Sec. 5-801 de la Ley de Vehículos y Tránsito de Puerto Rico, ante, y el otro por una supuesta infracción a la Sec. 3-301 de la referida ley, 9 L.P.R.A. sec. 721, ambos delitos menos graves.

[4] Con el propósito de acelerar los procedimientos, y para evitar tener que citar nuevamente al imputado de delito, su abogado, y los testigos del caso, se estila a nivel de instancia, una vez se determina causa probable en la vista preliminar, que el magistrado que preside dicha vista, cite "automáticamente" a las personas antes mencionadas para el acto de lectura de acusación y/o el acto del juicio.

septiembre de 1994, Molinari Such se encontraría cursando estudios en una universidad de los Estados Unidos. El día 21 de septiembre de 1994, y con el propósito de que se completara el descubrimiento de prueba, el tribunal de instancia suspendió el acto del juicio y procedió a reseñalar el mismo —sin objeción de la defensa—(5) para el día 15 de noviembre de 1994.

Así las cosas —y con motivo del "referéndum" que estaba señalado para celebrarse en Puerto Rico el día 6 de noviembre de 1994, "referéndum" mediante el cual los ciudadanos de este País votarían sobre unas propuestas enmiendas constitucionales— el 27 de octubre de 1994 se comenzó a difundir por las distintas estaciones de televisión del País un anuncio, el cual, en lo pertinente, comenzaba con un "frenazo", apareciendo en cámara el brazo de un niño, inerte, sobre el pavimento, escuchándose la voz de una persona que expresaba:

UN ACCIDENTE PUEDE CEGARLE LA VIDA
A CUALQUIERA,
AL CULPABLE LE ESPERARIA LA CARCEL,
PERO SI ES AMIGO DE ROSSELLÓ,
LA JUSTICIA ES DIFERENTE.

DE FORTALEZA VIENEN A SACARLO DEL LÍO
EL SUPERINTENDENTE PUEDE DECLARAR
NEGLIGENTE A LA VÍCTIMA,
SE OLVIDAN LAS PRUEBAS DE ALCOHOL.
AL RICO LO PROTEGEN SUS INFLUENCIAS,
EL POBRE SÓLO TIENE SUS DERECHOS. ...

¡CUIDADO!
AL QUE ABUSA DEL PODER
NO SE LE PUEDE DAR MAS PODER. Solicitud de *certiorari*, pág. 6.

La representación legal de Molinari Such, con fecha de 28 de octubre de 1994, partiendo de la premisa que el transcrito anuncio provenía del Partido Popular Democrá-

---

(5) Ello así surge de la "minuta" que recoge, y resume, lo acontecido ante el tribunal de instancia el día 21 de septiembre de 1994.

tico,([6]) le cursó una misiva al Presidente de dicha colectividad política, Hon. Héctor Luis Acevedo, en la cual expresaba que el referido anuncio obviamente se refería al caso de su representado, *le causaba un daño incalculable a éste*, y le solicitaba que tomara la acción correspondiente para que dicho anuncio fuera retirado de la televisión. Varios días más tarde, el 31 de octubre de 1994, la representación legal de Molinari Such radicó ante el tribunal de instancia una "Moción urgente para que se muestre causa y sobre otros extremos"; escrito en el cual expresó, en síntesis, que el referido anuncio impedía que su representado recibiera un juicio justo e imparcial. Solicitó del foro de instancia el señalamiento y celebración de una vista para dilucidar la procedencia jurídica del anuncio, su inmediata suspensión, y la posposición del juicio pautado para el 15 de noviembre de 1994.

El tribunal de instancia emitió, ese mismo día, una orden mediante la cual señaló una vista, a ser celebrada la misma el 1ro de noviembre de 1994. En adición, ordenó que se citara para dicha vista a los Lcdos. Héctor Luis Acevedo y Carlos Ortiz Morales, "en sus respectivas capacidades de Presidente y Director de Campaña del P.P.D.", al igual que a un representante de la agencia de publicidad productora del anuncio. La vista se llevó a cabo en el día señalado.([7]) El tribunal de instancia denegó la solicitud de paralización de la difusión del anuncio en controversia y ratificó el señalamiento de 15 de noviembre de 1994. En dicho día, la defensa reprodujo su señalamiento, solicitando que el juicio fuera pospuesto para una fecha posterior. Dicha solicitud fue denegada por el tribunal de instancia, procediéndose a comenzar el proceso de selec-

---

([6]) Hecho que, posteriormente, fue aceptado por el director de la campaña del "referéndum" del P.P.D.

([7]) Durante la misma, la representación legal de Molinari Such ofreció prueba testifical y documental que establecía la frecuencia con que había "salido al aire" el anuncio en controversia; esto es, un total de veintiuna (21) ocasiones desde el día 27 de octubre al 1ro de noviembre de 1994.

En adición, se presentó prueba documental y testifical sobre el número de hogares a los cuales había llegado el referido anuncio, promediando una cobertura del 80% del total de los hogares puertorriqueños.

ción del Jurado que decidiría, como juzgador de los hechos, la inocencia o culpabilidad de Molinari Such.([8])

Inconforme con la denegatoria del foro de instancia de suspender el juicio, Ricardo Molinari Such ha acudido ante este Tribunal —vía *certiorari*— en revisión de dicha determinación judicial, imputándole al foro de instancia haber errado:

> ... al Resolver No Ha Lugar una Moción de Suspensión radicada el 31 de octubre de 1994, resometida el 15 de noviembre de 1994 y declarada *Sin Lugar* el 16 de noviembre de 1994, en pleno abuso de la discreción judicial y violentando así el derecho del acusado a tener un juicio justo e imparcial. Solicitud de *certiorari*, pág. 4.

Mediante Resolución de fecha 18 de noviembre de 1994, ordenamos la paralización de los procedimientos a nivel de instancia, concediéndole término al Procurador General de Puerto Rico para que compareciera a exponer su posición respecto al recurso radicado. Dicho funcionario ha comparecido, oponiéndose a la solicitud de suspensión del peticionario Molinari Such. Estamos contestes, repetimos, en que procede la revocación de la resolución recurrida.

## II

No hay duda de que el accidente automovilístico en controversia, trágico por demás, recibió amplia cobertura en los medios noticiosos del País. Prácticamente todos los ciudadanos de este País somos testigos de ello. Dicha cobertura, tampoco debe haber duda, no sólo se debió al hecho lamentable y trágico de haber perecido en el mismo una

---

([8]) Durante dicho proceso de selección de jurado —el cual está en su etapa preliminar, *no* habiéndose juramentado, en forma definitiva, ningún jurado— se ha puesto de manifiesto que varios candidatos al mismo han expresado que no sólo han leído, y oído, sobre el "caso Molinari" sino que vieron y escucharon el anuncio político en controversia. Algunos de dichos candidatos a jurado han expresado que entienden "que Molinari Such es culpable y que éste viene en la obligación de traerles prueba sobre su inocencia".

joven madre con su joven hijo, sino que a otras circunstancias realmente ajenas a los hechos en sí; *circunstancias que no deben, ni pueden, ser consideradas en relación con la determinación de inocencia, o culpabilidad, que tendrá que hacer, en su día, el juzgador de los hechos.*

De cualquier forma, realmente no se necesita que uno sea muy perspicaz para poder aseverar, con cierto grado de seguridad, que, dada la masiva atención que el caso ha recibido de parte de la prensa del País y el hecho de que vivimos en una Isla de cien (100) por treinta y cinco (35), prácticamente todos y cada uno de los ciudadanos que residen en la misma han oído hablar de, o leído sobre, el "caso Molinari" y tienen alguna opinión sobre lo sucedido. Dicha conclusión cobra fuerza por lo acontecido, hasta la fecha, a nivel de instancia durante el proceso de desinsaculación del Jurado; esto es, las contestaciones que sobre el asunto han ofrecido los candidatos a jurados, a preguntas de los abogados de las partes, constituyen evidencia fehaciente de ello.

Ello no obstante, y como es de todos conocido, el mero hecho de que la ciudadanía —o los candidatos a integrar el Jurado en un caso en particular— tengan algún conocimiento sobre los hechos de un caso en específico, por razón de haber escuchado o leído sobre el mismo en los medios noticiosos, *no* es razón suficiente para suspender la celebración del juicio criminal que, en relación con unos hechos alegadamente delictivos, el Estado haya instado contra una persona.

Esto es, la procedencia de una solicitud de suspensión, de parte del imputado de delito, del juicio en su fondo de cualquier caso criminal, basada dicha solicitud en que el caso ha sido objeto de excesiva publicidad por parte de los medios noticiosos del País, dependerá de si dicho imputado puede demostrar, en forma satisfactoria, que la divulgación de noticias sobre su caso ha sido de tal naturaleza, impacto y exposición que efectivamente le privan del dere-

cho constitucional a recibir un juicio justo ante un Jurado imparcial;[9] *derecho que, como es sabido, forma parte del debido proceso de ley, el cual le garantiza a todo imputado de delito que su inocencia o culpabilidad únicamente podrá ser determinada a base de la evidencia admitida en el recinto judicial y no como producto de noticias o informaciones ajenas al proceso judicial propiamente.*[10]

Dicha demostración, de parte del imputado de delito, es requerida debido a que la sociedad, al igual que éste, tiene el derecho a que los procesos criminales se ventilen prontamente. Como expresáramos en *Pueblo v. Miró González*, 133 D.P.R. 813, 817 (1993), citando a *Pueblo v. Rivera Santiago*, 126 D.P.R. 810, 818 (1990), voto particular de la Juez Asociada Señora Naveira de Rodón, el derecho a juicio rápido es uno que " 'cobija tanto a los acusados como al Pueblo, en el sentido de que si bien los acusados tienen el derecho constitucional a ser juzgados con celeridad, *también la sociedad exige que aquellos a quienes se les acusa de violentar sus leyes sean juzgados con prontitud'* ". (Énfasis suplido.)

Es por ello que confrontado un magistrado, al comienzo de un caso y en etapa de la desinsaculación del Jurado, con un planteamiento sobre publicidad excesiva y adversa, éste deberá hacer todos los esfuerzos, razonables y a su alcance, por que se pueda seleccionar, para actuar como jurados, a doce (12) ciudadanos que puedan decidir el caso en forma imparcial y objetiva. En esta encomienda deberán mantener presente tanto el magistrado, como los abogados de las partes, que con toda probabilidad será imposible conseguir personas que no hayan leído o escuchado alguna información sobre el caso; razón por la cual lo verdaderamente importante no será el conocimiento, o ignorancia, que so-

---

[9] Véase Sec. 11 del Art. 2 de la Constitución, L.P.R.A., Tomo 1; véanse, en adición: *Pueblo v. Moreno Morales II*, 132 D.P.R. 290 (1992); *Pueblo v. Hernández Mercado*, 126 D.P.R. 427 (1990); *Pueblo v. Lebrón González*, 113 D.P.R. 81 (1982).

[10] *Pueblo v. Miranda Santiago*, 130 D.P.R. 507 (1992); *Pueblo v. Maldonado Dipiní*, 96 D.P.R. 897 (1969).

bre el caso tengan dichos ciudadanos *sino que lo será la integridad de las personas escogidas y la firmeza de su compromiso de resolver el caso únicamente a base de la prueba que sea admitida en el juicio.*[11]

A esos efectos y fines, los magistrados de instancia podrán tomar, entre otras, medidas tales como: llevar a cabo un *voir dire* exhaustivo y riguroso con el propósito de indagar sobre cuán extenso es el conocimiento pre con juicio adquirido por los candidatos a jurados y sobre los efectos que dicha información ha tenido sobre ellos; otorgar a las partes recusaciones perentorias adicionales a las provistas por la Regla 123 de Procedimiento Criminal, 34 L.P.R.A. Ap. II; impartir, desde el comienzo del caso, instrucciones cuidadosas y exhaustivas sobre la responsabilidad de dichos ciudadanos al actuar como jurados y lo que se espera de ellos; y "secuestrar" al Jurado una vez el mismo ha sido escogido y juramentado en definitiva.[12]

En el presente caso, sin embargo, realmente *no* nos enfrentamos a un planteamiento "clásico" sobre publicidad, pre juicio, excesiva y adversa *por parte de los medios noticiosos del País.* Esto es, no obstante la amplia cobertura, y atención, que la prensa radial, televisiva y escrita le ha dado, y brindado, al caso hoy ante nuestra consideración, la representación legal del peticionario Molinari Such, que tengamos conocimiento, nunca ha planteado, ni a nivel de instancia ni ante este Tribunal, que su representado no puede obtener un juicio justo e imparcial debido a la publicidad excesiva que ha recibido el caso de parte de los medios noticiosos del País. En relación a ello es de notar, como señaláramos en la relación que de los hechos hiciéramos al comienzo del caso, que la defensa *no* objetó el señalamiento para juicio de 15 de noviembre de 1994 que el tribunal de instancia hiciera en el caso.

---

[11] *Pueblo v. Miranda Santiago*, ante; *Pueblo v. Lebrón González*, ante.

[12] *Pueblo v. Hernández Mercado*, ante.

## III

A lo que realmente nos enfrentamos en el presente caso es a un planteamiento sobre publicidad adversa, de carácter sui géneris, de parte del peticionario Molinari Such; esto es, sobre una alegada imposibilidad de recibir un juicio justo e imparcial *por razón de la difusión en la televisión de un anuncio político pagado*, relacionado el mismo con el referéndum celebrado el pasado 6 de noviembre de 1994, y que "salió al aire", por primera vez, el 27 de octubre de 1994. *Dicha situación, naturalmente, puede tener el mismo efecto contaminador y perjudicial en los potenciales candidatos a jurados que una publicidad masiva y adversa por parte de los medios noticiosos.*(¹³)

Hemos observado el "tape o cinta video magnetofónica" de dicho anuncio en varias ocasiones; "cinta" que no sólo fue presentada ante el foro de instancia sino que fue acompañada como anejo del recurso de *certiorari* radicado ante este Tribunal. *Varias conclusiones se derivan de dicho examen u observación.* En *primer* lugar, el anuncio *obviamente* se refiere al caso hoy ante nuestra consideración.(¹⁴) *Por otro lado*, resulta *igualmente obvio* que el mensaje contenido en el mismo resulta ser perjudicial para el peticionario Molinari Such. El mismo es uno *sumamente impactante.* Como correctamente expresa la representación legal de éste en el recurso radicado, en dicho anuncio se parte de la premisa que el peticionario Molinari Such es culpable de los hechos que se le imputan y que, por ser

---

(¹³) La diferencia entre ambas situaciones radica en que, en el caso hoy ante nuestra consideración, los intereses "en pugna" lo son el "derecho de expresión" del partido político que publicó el anuncio *vis-à-vis* el derecho a un juicio justo e imparcial de parte del peticionario Molinari Such. Véase *Colón v. Romero Barceló*, 112 D.P.R. 573 (1982).

En el caso "ordinario" de publicidad masiva y excesiva por parte de los medios noticiosos del País, los derechos en pugna lo son el antes mencionado derecho a un juicio justo e imparcial del acusado *vis-à-vis* el derecho a la libertad de prensa.

(¹⁴) Hecho que, inclusive, aceptó el juez de instancia al negarse a suspender el juicio.

"amigo de Rosselló", el peticionario ha recibido y/o recibirá trato preferente de parte de nuestro sistema de justicia; lo cual puede llevar, o presionar, a los miembros del Jurado a hacer una determinación final con total abstracción de la prueba que se presente en el caso. En *tercer* término, el anuncio en controversia —posiblemente distinto a la cobertura anterior de que fue objeto el caso de parte de los medios noticiosos del País— *le inyecta, de forma directa, un ingrediente político-partidista al caso*; hecho que, dado el alto clima de politización que reina en nuestra Isla, definitivamente puede afectar la expectativa, y el derecho, del peticionario Molinari Such a recibir un juicio justo e imparcial. Por *último*, y conforme la prueba presentada a nivel de instancia por la representación legal del peticionario, dicho anuncio fue visto en un 80% de los hogares puertorriqueños.(15)

En vista a todo lo anteriormente expresado, y tomando en consideración el hecho de que ésta realmente sería la primera suspensión del caso,(16) somos del criterio que se sirven mejor los intereses de la justicia con la posposición, *por un tiempo prudente y razonable*, del juicio en el presente caso. Dicha posposición, aun cuando ciertamente no constituye una garantía absoluta de imparcialidad por parte del juzgador de los hechos en el nuevo señalamiento, provee *un período razonable de "enfriamiento"* que —en unión a las *medidas cautelares* antes mencionadas que podrá tomar el tribunal de instancia al reactivarse el proceso de desinsaculación del Jurado— seguramente permitirá que el peticionario Molinari Such obtenga un juicio justo e imparcial. *Esto es, uno en que el juzgador de los hechos*

---

(15) Que el mismo tuvo una cobertura, y alcance, extenso lo demuestra, en adición, las contestaciones que brindaron varios de los jurados durante el proceso de desinsaculación de jurado que hasta la fecha se ha llevado a cabo a nivel de instancia.

(16) El señalamiento "automático" del 15 de septiembre de 1994 fue dejado sin efecto por acuerdo entre los abogados de las partes y el tribunal de instancia; ello debido al hecho que no había habido realmente tiempo para realizar, y terminar, el descubrimiento de prueba.

*determine su inocencia o culpabilidad exclusivamente a base de la prueba que sea admitida durante el proceso por el tribunal de instancia y a base de las instrucciones que dicho foro le brinde al Jurado.*

## IV

Ello no obstante, deseamos adicionalmente dejar constancia de nuestro sentir sobre los hechos que originaron el recurso que hoy resolvemos.

Resulta verdaderamente preocupante que un partido político y/o las personas que dirigen los destinos del mismo hayan incurrido en la *insensible* conducta que desembocó en la difusión del anuncio en controversia. La razón para la difusión del anuncio, por parte del referido partido político, era clara: el mismo adelantaba los intereses de dicha colectividad política en el referéndum que se celebró en Puerto Rico el pasado 6 de noviembre de 1994. Igualmente claro, sin embargo, resultaba ser el hecho de que la difusión de dicho anuncio afectaba y perjudicaba, *de manera sustancial*, los derechos que le garantiza la Constitución del Estado Libre Asociado de Puerto Rico al peticionario Molinari Such; persona que estaba próxima a ser enjuiciada.

A nuestra manera de ver las cosas, resulta hasta aterrorizante que el clima de politización extrema que existe en nuestra Isla haya causado que el propósito de adelantar intereses político-partidistas haya prevalecido, *sin más,* en esta situación. Esto es, que así se haya actuado con total abstracción del enorme daño que se sabía que la difusión del anuncio le causaría no sólo a un ciudadano en particular sino que a la sociedad puertorriqueña en general. *No adelantamos nada, como seres humanos, exacerbando a la ciudadanía y sembrando cizaña entre los miembros de nuestra sociedad; actuación la cual, inclusive, puede causar, en un momento determinado, confrontaciones y desgra-*

*cias entre familias puertorriqueñas.* Ello así ya que anuncios de esta naturaleza pueden llevar a los ciudadanos a perder la fe en el sistema judicial puertorriqueño y, en consecuencia, a "tomar la justicia en sus propias manos".

Dicho de la manera más sencilla —e independientemente del incuestionable hecho de que los partidos políticos, al igual que los ciudadanos, tienen derechos que los tribunales vienen en la obligación de respetar y poner en vigor— *no* existe justificación alguna, de índole jurídica, para que el foro judicial permita la publicación indiscriminada de anuncios de la naturaleza del aquí en controversia.([17]) *En el "balance de intereses" que el foro judicial viene en la obligación de hacer en esta clase de situaciones, la balanza necesariamente se tiene que inclinar hacia la protección de los derechos del ciudadano.* No debe perderse de vista que el partido político en cuestión podía publicar y difundir, como lo hizo, un sinnúmero de *otros* anuncios que le permitían "educar" a la ciudadanía respecto a la posición que dicho partido sustentaba en el mencionado "referéndum", los cuales hacían *totalmente innecesario* el anuncio aquí en controversia.

*Es hora de que los ciudadanos de este País realicen el hecho de que, si es que interesan que el mismo tenga algún futuro, hay que hacer lo indecible por ponerle fin no sólo a la ola criminal que nos azota sino que al canibalismo político que, de manera rampante e insensible, existe en esta bendita Isla.* En el entretanto, y en cuanto a esto último, este Tribunal debe mantenerse atento a la ocurrencia de esta clase de situaciones y, como lo ha hecho en el presente caso, prontamente tomar la acción correctiva necesaria para mantener totalmente libre de influencias políticas los

---

([17]) El vehículo procesal apropiado para dilucidar dicho planteamiento lo era una acción civil sobre *injunction* y sentencia declaratoria. Véase *Colón v. Romero Barceló*, ante.

procesos criminales que se llevan a cabo en nuestra jurisdicción.