*1006 TEXTO COMPLETO DE LA SENTENCIA
El apelante Alexander Mangual Toledo nos solicita la revisión de la Sentencia dictada el 27 de enero de 2006, por el Tribunal de Primera Instancia, Sala de Caguas, (Hon. Alberto L. Pérez Ocasio). Mediante el referido dictamen, el apelante fue hallado culpable por un jurado y condenado a cumplir noventa y nueve (99) años de reclusión por el delito de asesinato en primer grado (EVI2005G004), y diez (10) años por infracción a la Ley de Armas (ELA2005G0014). Además, se le eximió de la pena especial dispuesta en la Ley Núm. 183 de 29 de julio de 1998. Estas penas serían cumplidas consecutivamente entre sí.
Luego de múltiples trámites para lograr la transcripción de los procedimientos, finalmente en junio de 2009 se presentó la misma. Por su parte, el 20 de octubre de 2009, el apelante presentó su alegato. Así también, el 28 de diciembre de 2009, la Oficina de la Procuradora General, en representación del Pueblo de Puerto Rico, presentó su alegato solicitando la confirmación del dictamen.
Resolvemos con el beneficio de las comparecencias, de los autos originales y de la Transcripción Estipulada de la Prueba Oral, no sin antes exponer, en lo pertinente, el trasfondo fáctico de lo acaecido.
n
El 12 de noviembre de 2004, el Estado presentó contra el apelante Alexander Mangual Toledo, denuncias en común y mutuo acuerdo con Jonathan E. Rodríguez Orta, por asesinato en primer grado y dos (2) infracciones al Art. 5.05 de la Ley de Armas. En esa ocasión, se determinó causa probable para arresto, fijándosele la correspondiente fianza y quedó señalada la correspondiente vista preliminar para el 24 de noviembre de 2004. Los hechos imputados ocurrieron el 25 de octubre de 2004, en los municipios de Gurabo y Cidra, donde resultó muerta la joven Maritere Herrera Cario mediante la utilización de un cuartón de madera y un cuchillo (armas blancas).
Luego de los trámites procesales de rigor, el 31 de enero de 2005, se presentaron acusaciones contra el apelante por infracciones al Art. 83 del Código Penal (Asesinato en Primer Grado) y al Art. 5.05 de la Ley de Armas. El acto de lectura de las acusaciones quedó pautado para el 3 de febrero y el comienzo del juicio para el 2 de marzo.
El juicio por jurado se celebró del 14 de noviembre al 21 de diciembre de 2005. La prueba de cargo comenzó con el testimonio de José Enrique Herrera Alicea (padre de la occisa) quién declaró para la fecha de los hechos *1007 (25 de octubre de 2004) residía en Ponce junto a su hija y su nieta de tres (3) años. Manifestó que poseía en conjunto con su hija una cuenta de cheques y ahorro con ATH del Banco Popular de Puerto Rico. Adujo que el día de los hechos, su hija salió para la universidad en el vehículo marca Honda, modelo Civic, tablilla DIR-496, a terminar unos laboratorios y él se quedó al cuidado de su nieta. Ese día habló por última vez con su hija a eso de las 7:00-p.m. y luego la llamó en varias ocasiones a su celular, pero ella no respondió. Al día siguiente, lo llamaron para que pasara por la Comandancia de la Policía de Caguas, pues el vehículo marca Honda, modelo Civic, tablilla DIR-496, había sido encontrado. Durante el recontrainterrogatorio adujo que conoció al apelante varias semanas antes de los hechos, cuando estando hospitalizada su nieta, su hija se lo presentó como Alex, sü amigo. T.E., a la pág. 8.
El segundo testigo de cargo fue el investigador forense, Germán Vázquez Tirado, quien adujo que el 26 de octubre de 2004 recibió una llamada de la investigadora Gisel E. Rivera Cintrón sobre una escena en el Barrio Rabanal de Cidra. Acudió en compañía de la agente María E. Burgos García a tomar fotos de la escena, del terreno yermo, al vehículo Honda, modelo Civic color rojo que se encontraba cerrado y en su interior había un canasto de baloncesto haciéndole presión al acelerador. T.E., a la pág. 18. Al abrir el baúl de dicho vehículo, se encontró un cadáver de una joven. T.E., a la pág. 19.
La señora María Elizabeth Burgos García, investigadora forense, declaró que fue la encargada de tomar el video de la escena exterior en un área rural bastante solitaria, boscosa, oscura y cubierta de neblina. T.E., a las págs. 50, 71-72. En el baúl del Honda se encontró el cadáver de una joven que vestía una camisa sin mangas y un “panty” color rojo, acercó la toma de video a su rostro, captó la ubicación y la posición en la que se encontraba, esto para propósitos de identificación. Durante su testimonio, hizo una breve descripción de los hematomas y heridas que presentaba el cadáver. T.E., a la pág. 74. El video tomado en DVD fue embalado, documentado y colocado en la caja fuerte del Instituto de Ciencias Forenses.
Luego prestó testimonio la investigadora forense Gisel E. Rivera Cintrón quien preparó un croquis del lugar donde fue encontrado el cadáver de la occisa. Originalmente preparó un borrador a mano, trabajó con el cadáver que se encontró en el baúl del Honda color rojo. Indicó que sacaron el cadáver del baúl y se fueron tomando fotos y video. T.E., a la pág. 108. El cadáver era de una mujer blanca con un tatuaje de mariposa en la espalda, vestía camisa y panty y presentaba heridas punzantes y hematomas. Dentro del baúl se encontró un mahón azul y una camiseta roja las cuales fueron levantadas como evidencia y referidas al laboratorio de DNA y Serología. T.E., a la pág. 108.
Durante la audiencia también prestó testimonio el señor Edwin Manuel Vázquez Rodríguez e indicó que el 12 de noviembre de 2004, aproximadamente a las 2:30 a 3:00 p.m., tomó video de una casa abandonada ubicada en el Barrio Masas de Gurabo en compañía de los agentes Emiliano Santos Pedraza y Miguel Torres. T.E., a la pág. 148.
Posteriormente, testificó el agente Emiliano Santos Pedraza quien adujo que recibió una llamada del agente Antonio Izquierdo para realizar una reconstrucción de escena en una casa abandonada, de tres niveles, en el Barrio Masas de Gurabo. Indicó que Miguel Torres estuvo a cargo de tomar fotografías mientras que el agente Edwin Vázquez tomó el video. Relató que las manchas de sangre comenzaban en el segundo nivel de la residencia, que hallaron un panel de madera con sangre y había manchas de sangre que habían sido cubiertas con pintura. Por su parte, el señor Eli Javier Nieves Pérez testificó que para la fecha de los hechos residía en Canóvanas junto a su hermana, su madre y su hermano Israel Nieves Pérez, quien a su vez es testigo en el caso. Trabajaba despachando gasolina en Madiel Service Station, en el turno de 1:00 a 9:00 p.m. Indicó que conocía al apelante por razón de que había estudiando con su hermana en la escuela superior y meses antes habían compartido en un grupo de amistades. Manifestó que el día de los hechos, el apelante, en compañía del co acusado Jonathan Rodríguez Orta, llegó a la gasolinera en el vehículo de este último, un Toyota, modelo Paseo, color azul verdoso. Indicó que el apelante le pidió prestado su teléfono celular (787-648-1970), el cual estaba a *1008 nombre de su jefe, Lemuel Carrasquillo Aristud. Poco tiempo después, a eso de las 4:30 0 5:00 p.m., el apelante, junto al co acusado, se fueron, indicándole que volverían más tarde. Regresaron como a eso de las 6:00 a 7:00 p. m. y el apelante nuevamente le pidió su teléfono celular prestado. A las 7:30 se marcharon de la gasolinera. Declaró que salió del trabajo poco después de las 9:00 p.m. y fue al restaurante de comida china a comer y a esperar por su hermano (Israel Nieves Pérez) y sus amistades (Carlos Iván Flores Sánchez alias Cuqui, Angel José Orta alias Wiso y Oscar E. Guadalupe Orta); y luego llegó su hermano Israel Pérez Nieves. T.E., a la pág. 282. Acostumbraban reunirse allí por las noches. Cuando cerraron el restaurante de comida china, se trasladaron a un negocio de verduras (que estaba cerrado), que es como un ranchito, para hablar, vacilar y fumar marihuana. T.E., a las págs. 248-250. Al rato llegó el apelante manejando un Honda color rojo o vino que tenía una mariposa en el lado del chofer. T.E., a la pág. 251. Oscar Guadalupe Orta estaba hablando con el co acusado y el resto de los muchachos se quedó en un banquito del negocio, frente al vehículo. T.E., a la pág. 252. Declaró que se aproximó al apelante y le preguntó de quién era ese carro y éste le contestó que pertenecía a una amiga. Entonces, Jonathan (co acusado) gritó “la matamos”. Éste no le creyó, le pidió al apelante que abriera el baúl porque no había nadie dentro del vehículo y luego que el apelante levantó un poco la puerta del baúl, pudo ver una silueta. Entonces, el co acusado vino y le gritó al apelante “qué tú haces loco”, dio un puño y trancó el baúl. T.E., a las págs. 252-253. Luego de esto, se montaron y se fueron. Indicó que se quedó un rato allí y luego se fue a su casa a tratar de dormir. Al día siguiente, cuando lo buscó su jefe, Lemuel Carrasquillo Aristud, le contó lo que había ocurrido para que él lo supiera por si le pasaba algo. T.E., a las págs. 253-255 y 293. Declaró que fue el primer sospechoso arrestado por el asesinato de la causa de autos y citaron a su jefe, esto, debido a que se utilizó el teléfono que él poseía para realizar llamadas al celular de la occisa. T.E., a la pág. 297.
El juicio continuó con el testimonio del señor Lemuel Carrasquillo Aristud. Declaró que el 26 de octubre de 2004, como entre 6:30 a 7:00 a.m., buscó a Eli Javier Nieves Pérez y éste le contó que el apelante y el co acusado habían asesinado a una muchacha. Que el día anterior se fue a los chinos con los muchachos y el apelante y el co acusado llegaron en un Honda, dijeron que habían matado una muchacha, uno de ellos abrió el baúl y el otro dijo “acho tú estás loco”, luego de eso se fueron. T.E., a las págs. 306-318, 321.
La prueba continuó con el testimonio del señor José R. Aponte Ortiz, analista de fraude de la compañía Cingular Wireless. Declaró que el número de teléfono 787-397-3813, para el 25 de octubre de 2004, pertenecía a Maritere Herrera Cario, la occisa. Indicó que en la fecha de los hechos ese número de teléfono recibió seis llamadas del número de teléfono 787-648-1970 (número de teléfono desde el cual el apelante, realizó varias llamadas a Maritere). Aunque surgió una aparente diferencia entre los documentos, entre los que genera el área de fraude y los que produce el área de facturación debido a la diferencia entre minutos consumidos (“real time”, información cruda, que es el aspecto que investiga la división de fraude para el cual él trabaja) y los minutos facturados. Así, explicó, que el Departamento de Facturación realiza un proceso de verificación y “limpia” la información cruda de llamadas. Aparecen llamadas a las 4:24 p.m.; 5:47 p.m.; 6:19 p.m.; 6:33 p.m.; 6:44 p.m. y la última llamada fue a las 7:21 p.m. del 25 de octubre de 2004. T.E., a las págs. 327-337-340-350 y 352-353.
Por su parte, declaró la señora Zobeira Meléndez Ríos quien labora en el Departamento Legal de Centennial de Puerto Rico e indicó que el número de celular 787-648-1970, para el 25 de octubre de 2004, pertenecía al señor Lemuel Carrasquillo Aristud. Declaró que para el 25 de octubre de 2004, desde ese número se llamó al 787-397-3813 (perteneciente a la occisa, Maritere), duró un minuto la llamada y se realizó otra llamada a ese mismo número en esa misma hora, la cual también duró un minuto. Continuó diciendo que para esa misma fecha, a las 4:19 p.m., se realizó otra llamada al 787-397-3813 que duró un minuto, a las 4:22 p.m. se recibe en el celular del señor Carrasquillo una llamada del 787-397-3813, ésta duró unos II minutos; otra llamada generada del 787-397-3813, a las 5:44 p.m., duró 5 minutos. Más tarde, a las 6:16 p.m., del celular del señor Carrasquillo se llamó al 787-397-3813 (de la occisa), la cual tuvo unos 13 minutos de duración, y otra llamada en tales condiciones a las 6:29 p.m. tuvo un minuto de duración; y otra a las 6:31 p.m. que duró unos 2 minutos. Luego dos llamadas más, a las 6:42 p.m. y otra a las 7:18 p.m., de 5 minutos y 2 minutos, respectivamente. T.E., a las págs. 364, 368-369.
*1009 Oscar E. Guadalupe Orta declaró que el 25 de octubre de 2004, se encontraba en el restaurante chino, junto a sus amigos Carlos Iván Flores Sánchez alias Cuqui, Eli Javier Pérez Nieves alias Gringo y su primo Ángel José Orta alias Wiso. T.E., a la pág. 433. Estaban todos vacilando y una vez cerró el restaurante, se trasladaron al negocio de venta de verduras, que estaba cerrado. Estaban fumando marihuana. T.E., a las págs. 371-374. Una vez allí, llegó el apelante conduciendo un vehículo Honda color rojo, acompañado del co acusado Jonathan, quien es su primo. Este lo llamó aparte y le pidió que lo acompañara para entregarle el Honda a la hermana del apelante. Manifestó que mientras hablaba con el co acusado, el apelante estaba cerca del Honda, junto a Eli Javier Pérez Nieves y abrió un poco el baúl. Subsiguientemente, el co acusado se movió de su lado y fue y cerró la puerta del baúl. Declaró que llamó a su primo Ángel José Orta alias Wiso para que lo acompañara hacia la casa de la hermana del apelante. Entonces él y Ángel José Orta alias Wiso se fueron en su vehículo, un Nissan 300 ZX, color oro y el apelante y el co acusado se fueron en el vehículo Honda color rojo. El apelante iba conduciendo e iba delante de ellos. Llegaron a una intersección, era un lugar bastante oscuro. Declaró que el apelante viró, por lo que él se estacionó y se quedó dentro de su vehículo y le dijo a Wiso que se bajara y así lo hizo. Mientras él estaba jugando con el radio, el Honda le pasó por el lado y se fue por el monte para abajo. Se asustó porque pensaba que el apelante y el co acusado estaban dentro del vehículo. Entonces, de repente, llegaron el apelante y el co acusado, y le gritaban que arrancaran. Él, asustado, arrancó, dirigiéndose hacia Caguas. Entonces pararon en una gasolinera, porque había una ATH, ya que el co acusado se proponía realizar una transacción en la ATH. Cuando el co acusado viró de la ATH, dijo que sólo había $1.25 ó $1.50. Tras ello, el apelante dijo “le pasó esto por nada”. Luego salieron hacia Gurabo, se detuvieron en una gasolinera Citgo para echar gasolina, les dijo a todos que se bajaran para que estiraran las piernas porque su carro es de dos personas. Una vez esto ocurrió el apelante le dijo que lo notaba nervioso y que si se atrevía a decir algo iba a tener problemas. T.E., a las págs. 375-387. Estando en la gasolinera, llegó una patrulla y el apelante le dijo que abriera el bonete y que hiciera que estaba chequeando el carro. Luego se montaron en el carro, el co acusado le preguntó a Wiso si tenía una repuesta porque se le había explotado una goma. Se dirigieron a la casa de Wiso, en Barrazas, a buscar la repuesta que le iba a prestar a Jonathan. Wiso se quedó en su casa y el apelante y el co acusado se montaron en el carro y se dirigieron a Gurabo, Sector Santa Rita, más o menos donde reside. Cuando el co acusado se le acercó para agradecerle, él le dijo que no le había gustado lo que había pasado y que cada cual por su lado. T.E., a las págs. 387-389.
Durante el juicio prestó testimonio Ángel L. Quiñones Orta (alias Wiso). Declaró que el 25 de octubre de 2004, como a las 10:00 p.m., se encontraba con Eli Javier Pérez Nieves, Javier y Carlos Iván Flores Sánchez alias Cuqui fumando marihuana en el banquito de madera del negocio de verduras y llegaron el apelante y el co acusado en un Honda color rojo. El co acusado se bajó y llamó a Oscar Guadalupe Orta aparte para hablar; estaban cerca del vehículo de Oscar (Nissan 300 ZX). El apelante estaba hablando con Eli Javier Pérez Nieves. Declaró que el co acusado, quien es su primo, se le acercó para pedirle que lo acompañara a Masas a buscar el carro, accedió y se fue en el carro de Oscar. El apelante y el co acusado iban delante en el Honda color rojo. Cuando pasaron la entrada de Masas, Oscar le dijo que iban a llevar el Honda a casa del hermano del apelante. Llegaron a una intersección en Cidra, una carretera oscura, Oscar viró el carro, él se bajó y se quedó como a 2 pies cerca del carro, el co acusado mandó a Oscar a estacionar su vehículo como si fuera hacia el risco. El apelante estacionó el Honda y el co acusado buscó en los alrededores un canasto de baloncesto “Fisher Price” y lo colocó al lado del carro porque el apelante le había dicho que buscara algo para ponerlo en el acelerador. Viró la mirada y cuando volvió a mirar ya habían acelerado el vehículo y después el apelante lo puso en cambio y entonces el Honda se fue risco abajo. Luego de ello, corrieron y se montaron en el vehículo de Oscar y se fueron hacia Carolina. En el trayecto pararon en una ATH del Texaco de Cidra, Carretera Número 187, porque iban a sacar dinero. El apelante mandó al co acusado a sacar un dinero. Éste bregó un ratito con la ATH y cuando regresó dijo que todo había sido en vano porque sólo había $1.35, $1.30 o algo así. Luego de ello fueron para el Citgo de Gurabo, Oscar echó gasolina. Declaró que se compró unos Doritos y volvió hacia el carro, cuando regresó vio el bonete abierto, porque el apelante había mandado a Oscar a subir el bonete como si el carro estuviera caliente porque había unos guardias. Luego fueron a su casa porque le iba a prestar una goma al co acusado, que tenía una goma explotada. Se quedó en su casa. T.E., a las págs. 418-429, 438, 447, 516-518, 536 y *1010 543. Tres o cuatro días después, estaba en el cruce con Carlos Iván Flores Sánchez alias Cuqui, el co acusado, el apelante y otro grupo más. Allí, el co acusado le pidió que lo acompañara a la casa abandonada de Masas porque iban hacer algo, pero no le dijeron qué. Indicó que solían ir allá a fumar marihuana. El, Carlos Iván (Cuqui), el apelante y el co acusado fueron en el vehículo de este último hacia allá, parando antes a buscar unos potes de “spray” de pintura y se dirigieron a la casa de Masas. Mientras fumaba, subió al tercer piso de la casa abandonada, en las escaleras había sangre y el apelante y el co acusado estaban pintando con los potes de “spray” las manchas de sangre. Mientras Carlos Iván (Cuqui) estaba en el tercer piso, el apelante se puso a contarle, con malicia, que le había dado con un cuartón a la muchacha, la había “esgollao”. T.E., a las págs. 429-434 y 528-534.
Por su parte, la señora María Hernández Miranda declaró que labora como receptora de evidencia del Instituto de Ciencias Forenses y fue quien realizó varios ítems de evidencia que se levantaron de la escena donde se halló el cadáver, de la casa abandonada y durante la autopsia, éstos consistieron en ropa, muestras de sangre, los dientes que se desprendieron del cadáver y fueron encontrados en la casa abandonada. Esta evidencia hallada correspondía con el cadáver de Maritere Herrera Carlo. T.E., a las págs. 448-486.
La prueba continuó con el testimonio de la agente Wanda Luz Correa Coriano de la División de Homicidios de Caguas y quien el 20 de noviembre de 2004 fue junto a otros compañeros a la casa abandonada cita en el Barrio Masas del Municipio de Gurabo. En el lugar encontraron cuatro (4) dientes, una pantalla de lengua y una cerradura tipo cangrejito, se levantó, la tuvo bajo custodia en su locker y el próximo día laborable se llevó al Instituto de Ciencias Forenses. T.E., a las págs. 544-557.
De otra parte, testificó Héctor Quiles Rosario quien el 25 de octubre de 2004 recibió una llamada por radio de la Policía para que investigara una querella de un vehículo que había sido arrojado por un terreno baldío y riscoso en la Carr. 173 del Barrio Rabanal de Cidra. El vehículo estaba encendido, la parte delantera de éste estaba destrozada, el radiador estaba roto, lo apagaron y luego abrieron el baúl encontrando el cadáver de una mujer. Entonces se llamó al Instituto de Ciencias Forenses y al CIC, en fin, a todo el equipo técnico para cubrir la escena. T.E., a las págs. 558-586.
Así también, prestó testimonio la señora Aida E. Villegas Álvarez, quien se desempeña como Técnica de Huellas Dactilares y rindió el Informe de Análisis de Huellas Dactilares, el cual resultó negativo. T.E., a las págs. 587-596.
Posteriormente, Israel Pérez Nieves (hermano de Eli Javier Pérez Nieves) declaró que el 25 de octubre de 2004 se encontró con los muchachos en el negocio de verduras que frecuentaba. Ellos estaban fumando marihuana. Al rato llegaron el apelante y el co acusado en un Honda color rojo. Su hermano, Eli Javier Pérez Nieves, se fue a hablar con el apelante y el co acusado estaba más distante hablando con Oscar. Declaró que le preguntó al apelante de dónde habían sacado el carro. El apelante hizo gesto para abrir el baúl y el co acusado vino y lo trancó. Después, el apelante y el co acusado se fueron en el Honda y Angel José Orta se fue con Oscar Guadalupe Orta en el carro de este último (Nissan, 300 ZX). Luego que se fueron su hermano, Eli Javier Pérez Nieves, le comentó que había algo en el carro. T.E., a las págs. 649-656. Manifestó que cuando arrestaron a su hermano fue donde el co acusado a preguntarle qué había pasado, que habían usado el teléfono de su hermano y fue arrestado. Luego se fue con Carlos Iván Flores Sánchez (Cuqui) y el co acusado a San Juan, Piñones y cuando iban por los Colobos fueron arrestados. T.E., a la pág. 657.
El Ministerio Público continuó su presentación de la prueba con el testimonio de la señora Lilliam Betances Figueroa. Declaró que labora como oficial de requerimiento legal del Banco Popular. Con relación al caso indicó que se recibió un subpoena sobre una Cuenta bancaria que estaba a nombre de José F. Herrera Alicea y/o Maritere Herrera Carlo y que para la fecha del 25 de octubre de 2004 la sección de cheques tenía un balance disponible de $10,938.80 y la sección de ahorros tenía disponible $1.25. Certificó asimismo, que se trató de rechazar una transacción a las 23:07 del 25 de octubre en la máquina de ATH que ubica en la Carr. 172, Sector La Sierra, de *1011 Caguas. T.E., a las págs. 643, 647-649.
Luego declaró el doctor José G. Serrano Serrano, quien realizó la patología al cadáver de Maritere Herrera Cario. Adujo que el cadáver presentaba múltiples evidencias externas de traumas, un total de 25, que se desglosan en múltiples heridas de arma blanca, fractura del lado izquierdo del esqueleto cráneo facial producida por un golpe con un objeto contundente; laceraciones en la región de la cara, párpados, contusiones en la parte inferior, parte anterior de las piernas, a nivel de la rodilla, contusión en el muslo derecho, por la región púbica hasta la cadera, una herida de arma blanca inciso punzante en la región de la mandíbula, que penetró y produjo una fractura mandibular. También tuvo una laceración del labio inferior con fractura de la mandíbula, que tiene fractura de los dientes, es decir, que perdió varios dientes porque el golpe es de tal magnitud que desprendió hasta los tejidos que anclan los dientes al hueso. T.E., a las págs. 757, 776-784. Determinó que tanto los golpes propinados con el objeto contundente como las heridas de arma blanca contribuyeron conjuntamente la muerte de Maritere. Precisó que los golpes con el objeto contundente fueron de tal severidad y magnitud que produjeron daño severo y que indudablemente le iban a producir la muerte. Aun si exclusivamente se tratara de heridas de arma blanca, también le hubieran podido producir la muerte. Por consiguiente, indicó que las causas de la muerte fueron severo trauma corporal o cráneo cerebral por golpes con un objeto contundente y perforación y laceración de órganos por heridas de arma blanca. Llamó la atención que el cadáver no se vio heridas de defensa, lo que lo llevó a concluir que el golpe con el objeto contundente fue suficientemente serio como para producir inconciencia o descompensar la capacidad de la víctima para defenderse. T.E., a las págs. 785-786.
La prueba del Ministerio Público concluyó con el testimonio del agente Antonio Izquierdo Ocasio. Declaró que se trasladó con Cuqui, Carlos Iván Flores Sánchez, a la residencia abandonada donde, según la información suministrada por los testigos, se dio muerte a Maritere Herrera Cario. Indicó que una vez en la residencia, Carlos Iván le dijo que había estado en ese lugar anteriormente, pues el 27 de octubre fue con el apelante y el co acusado al lugar y pudo observar mucha sangre, y que el apelante comenzó a rociar con pintura en spray color verde toda la sangre, mientras simultáneamente, le narraba que en el tercer nivel, específicamente en el balcón, el apelante le dio con un cuartón en el rostro a Maritere Herrera Carlo y que ésta cayó al piso y el co acusado, utilizando un arma blanca, le propinó varias puñaladas en el cuello para que ella no sufriera. Luego el apelante y Jonathan la arrastraron por todas las escaleras y la colocaron en el baúl del Honda. T.E., a las págs. 853-854.
Así las cosas, el 21 de diciembre de 2005, luego de haber examinado y analizado la evidencia documental, consistente de fotografías, videos, diagramas e informes, así como el testimonio de los testigos y adjudicar credibilidad, el jurado en votación de once a uno emitió un veredicto de culpabilidad en los delitos imputados. Se señaló el acto del pronunciamiento de la sentencia para el 23 de diciembre de 2005.
Finalmente, como hemos informado, el 27 de enero de 2006, se dictó la sentencia objeto del recurso en la cual se le impuso al apelante una pena de reclusión de ciento nueve (109) años por ambos delitos.
III
Inconforme con el dictamen, el 24 de febrero de 2006, el apelante presentó su recurso de apelación. En síntesis, alegó los siguientes señalamientos de error: 1) al jurado rendir un veredicto de culpabilidad con una prueba que no derrotó la presunción de inocencia ni se demostró su culpabilidad más allá de duda razonable; 2) al admitir en juicio documentos que no fueron entregados durante el proceso de descubrimiento de prueba (Regla 95 de Procedimiento Criminal); 3) al admitir documentos que durante el juicio fueron distintos a los entregados por el Ministerio Público durante el descubrimiento de prueba; 4) al permitir un descubrimiento de prueba continuo por parte del Ministerio Público durante todo el juicio entregando documentos y evidencia para examinar y sin darle oportunidad a la defensa para prepararse adecuadamente para contrainterrogar con relación a éstos; 5) al demostrar prejuicio o parcialidad y de esta forma no permitir un veredicto justo e imparcial por parte del jurado; y 6) que la inutilización sufrida por uno de los videos presentados al jurado durante el juicio impide una completa y adecuada apelación debido a la imposibilidad de apreciar su efecto de perjuicio indebido sobre el jurado, razón *1012 por la cual se debe ordenar la celebración de un nuevo juicio.
En su primer señalamiento, el apelante adujo que el jurado incidió al emitir un veredicto de culpabilidad con una prueba que no derrotó la presunción de inocencia ni estableció su culpabilidad más allá de duda razonable.
La prueba del Ministerio Público consistió de los testimonios de: 1) el padre de la occisa, José E. Herrera Alicea; 2) Germán Vázquez Tirado, investigador forense; 3) María E. Burgos García, investigadora forense; 4) investigadora Gisel E. Rivera Citrón; 5) Edwin M. Vázquez Rodríguez, investigador forense; 6) Emiliano Santos Pedraza, agente; 7) Eli J. Nieves Pérez; 8) Lemuel Carrasquillo Aristud; 9) José R. Aponte Ortiz, analista de fraude de Cingular Wireles; 10) Zobeira Meléndez Ríos, del Departamento Legal de Centennial de Puerto Rico; 11) Oscar E. Guadalupe Orta; 12) Angel L. Quiñones Orta; 13) María Hernández Miranda, receptora de evidencia del Instituto de Ciencias Forenses; 14) Wanda L. Correa Coriano, agente adscrita a la División de Homicidios de Caguas; 15) Héctor Quiles Rosario, agente; 16) Aida E. Villegas, técnica de huellas dactilares; 17) Israel Pérez Nieves; 18) Lilliam Betances Figueroa, oficial de requerimiento legal de Banco Popular; y 19) el agente, Antonio Izquierdo Ocasio. Además, dicho funcionario presentó en evidencia dos (2) Informes de Ciencias Forenses y varias fotos de la occisa y de la escena del crimen, así como dos (2) videos tomados en la escena.
Es norma reiterada, que en los casos criminales, la culpabilidad del acusado debe establecerse más allá de duda razonable en cuanto a todos los elementos del delito y su conexión con el acusado, en una vista, con todas las garantías del debido proceso de ley. Es por tanto, obligación del Ministerio Público presentar prueba suficiente y satisfactoria que establezca más allá de duda razonable cada uno de los elementos del delito imputado. Art. II, § 11 de la Constitución del Estado Libre Asociado de Puerto Rico; Regla 10(F) de Evidencia, 32 L.P.R.A. Ap. IV, R. 10(f); Pueblo v. Rosario Orangel, 160 D.P.R. 592, 602 (2003); Pueblo v. Calderón Álvarez, 140 D.P.R. 627, 643 (1996); Pueblo v. Sánchez Molina, 134 D.P.R. 577, 586 (1993); Pueblo en interés del menor F.S.C., 128 D.P.R. 931, 941-942(1991).
El Ministerio Público descarga su responsabilidad de probar su caso más allá de duda razonable, cuando su prueba es suficiente y produce certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido. Pueblo v. Irizarry, 156 D.P.R. 780, 786-787 (2002). No obstante, la determinación que ha hecho el juzgador de los hechos a nivel de instancia a los efectos de que la culpabilidad del imputado de delito ha quedado establecida más allá de duda razonable, es una que es revisable como cuestión de derecho. Pueblo v. González Román, 138 D.P.R. 691, 708 (1995).
Por su parte, la Regla 110 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 110, recoge el concepto de presunción de inocencia en unión al de duda razonable. La Regla establece que:
“En todo proceso criminal, se presumirá inocente al acusado mientras no se probare lo contrario, y en caso de existir duda razonable acerca de su culpabilidad, se le absolverá. Si la duda es entre grados de un delito o entre delitos de distinta gravedad sólo podrá condenársele del grado inferior o delito de menor gravedad.” Pueblo v. Rodríguez Amor, 102 D.P.R. 158, 159 (1974).
En atención a la naturaleza del proceso criminal y los derechos constitucionales de un acusado, al acusado le acompaña la presunción de inocencia en cuanto a todo elemento esencial del delito y el peso de la prueba no cambia en etapa alguna del proceso. Pueblo v. Túa, 84 D.P.R. 39, 53 (1961).
En nuestra jurisdicción se ha establecido que: “[d]uda razonable es una duda fundada, producto del raciocinio de todos los elementos de juicio envueltos en el caso. No debe ser, pues, una duda especulativa o imaginaria.” Esto significa que no toda “duda posible tenga que ser destruida y que la culpabilidad del acusado se establezca con certeza matemática, sino que la evidencia establezca aquella certeza moral que convence, dirige la inteligencia y satisface la razón”. Instrucciones al Jurado para el Tribunal Superior de Puerto Rico, San Juan, *1013 Revista Col. Abogados, 1976, a la pág. 42. Véase, además, Pueblo v. Somarriba García, 131 D.P.R. 462, 472-473 (1992); Pueblo v. Bigio Pastrana, 116 D.P.R. 748, 761 (1985); y Pueblo v. Gagot Mangual, 96 D.P.R. 625, 627 (1968), entre otros.
Sabido es que “la evidencia directa de un testigo que merezca entero crédito es prueba suficiente de cualquier hecho, salvo que por ley otra cosa se disponga.” Regla 10(d), 32 L.P.R.A. Ap. IV, R. 10.
Al apelante se le acusó por los delitos de asesinato en primer grado y uso de arma blanca (cuartón de madera) para dar muerte a la joven Maritere Herrera Cario. Los testimonios de José E. Herrera Alicea, Eli J. Nieves Pérez, Oscar E. Guadalupe Orta, Angel L. Quiñones Oria, Israel Pérez Nieves, detallaron los sucesos que ocurrieron ese 25 de octubre de 2004 cuando la joven Maritere Herrera Cario salió desde su residencia en Ponce hacia la universidad y terminó muerta dentro del baúl de su vehículo. Así también, los testimonios de los agentes e investigadores forenses corroboraron las versiones de los hechos ofrecidas por los testigos. Ello unido a lo relatado por los representantes de las compañías de celulares sobre las llamadas hechas por el apelante a Maritere el día de los hechos y las transacciones infructuosas que hiciera el co acusado en la ATH para sustraer dinero de la cuenta de la ya occisa. Estos testimonios merecieron entera credibilidad al juzgador de los hechos, que este caso fue un jurado, pues estuvo corroborado con los hallazgos de las investigaciones policíacas y forenses realizadas por Germán Vázquez Tirado, María E. Burgos García, Gisel E. Rivera Citrón, Edwin M. Vázquez Rodríguez y Emiliano Santos Pedraza, entre otros. Si bien es cierto que hubo algunas lagunas y/o contradicciones en los informes sobre las llamadas realizadas desde y hacia el celular de Maritere, la declaración del oficial de Cingular Wireless aclaró la discrepancia. Lo cierto es que, en lo medular, el Ministerio Público demostró a satisfacción del jurado que el apelante en concierto y común acuerdo con el co acusado se comunicó en varias ocasiones con Maritere el día de los hechos y estando juntos en la residencia abandonada del Barrio Masas de Gurabo, la sorprendió con un golpe contundente y luego le infligieron varias heridas punzantes y la echaron al baúl de su auto, todo ello con la intención de robarle el dinero de la ATH. Dicho testimonio fue evaluado y ponderado por el jurado, quienes los vieron y escucharon declarar en el interrogatorio directo y luego en el contrainterrogatorio. Todos los agentes de la policía que intervinieron en la investigación, así como los investigadores forenses, corroboraron la versión en cuanto a los hechos y sus autores.
La jurisprudencia ha establecido reiteradamente que meras inconsistencias en el testimonio de un testigo no obligan al juzgador a descartarlo. Pueblo v. Burgos Hernández, 113 D.P.R. 834, 840-841 (1983). Por otro lado, el juzgador de los hechos en instancia es el que, de ordinario, está en mejor posición para aquilatar la prueba testifical, ya que fue el que oyó y vio declarar a los testigos. Pueblo v. Cabán Torres, 117 D.P.R. 645, 653-654 (1986). En Ortiz v. Cruz Pabón, 103 D.P.R. 939, 947 (1975), nuestro Tribunal Supremo expresó:
"... y es que no sólo habla la voz viva. También hablan las expresiones mímicas: el color de las mejillas, los ojos, el temblor o consistencia de la voz, los movimientos, el vocabulario no habitual del testigo, son otras tantas circunstancias que deben acompañar el conjunto de una declaración testifical, y sin embargo, todos estos elementos se pierden en la letra muda de las actas, por lo que se priva al Juez de otras circunstancias que han de valer incluso más que el texto de la declaración misma para el juicio valorativo que ha de emitir en el momento de fallar; le faltará el instrumento más útil para la investigación de la verdad: la observación...”.
Nuestro más Alto Foro de Justicia ha establecido que “debemos recordar que no existe el testimonio perfecto, el cual, de ordinario, en lugar de ser indicativo de veracidad, es altamente sospechoso por cuanto, por lo general, es producto de la fabricación.” Cabán Torres, 117 D.P.R., a la pág. 656.
De otra parte, nuestro esquema jurídico ha señalado que no se debe revocar una convicción a base de un planteamiento de insuficiencia de prueba que se refiera a credibilidad de testigos en ausencia de prejuicio, parcialidad o error manifiesto. Pueblo v. Acabá Raíces, 118 D.P.R. 369, 375 (1987). De lo contrario, “la intervención indiscriminada con la adjudicación de credibilidad que se realiza a nivel de instancia, significaría el *1014 caos y la destrucción del sistema judicial existente en nuestra jurisdicción." Cabán Torres, 117 D.P.R., a la pág. 648.
Del expediente ante nuestra consideración no se sostienen las alegaciones del apelante. Por el contrario, de la Transcripción Estipulada de la Prueba Oral surge con claridad que cuando el jurado analizó la totalidad de la prueba recibida consideró que el apelante había cometido los delitos imputados. Como hemos señalado, contrario a lo expresado por el apelante, el hecho de que un testigo incurra en contradicciones respecto a detalles de los documentos no es óbice para que no se le dé crédito a su testimonio, cuando nada increíble o improbable surge de éste. Pueblo v. Chévere Heredia, 139 D.P.R. 1, 20 (1995). En esencia, consideramos que todos los testimonios en conjunto con el resto de la prueba testifical fue suficiente para sostener las convicciones del apelante en el ánimo no prevenido del juzgador. Cabe señalar, que el foro sentenciador tuvo prueba robusta y convincente tanto científica como documental para corroborar el testimonio de cada unos de los testigos sobre la forma en que transcurrieron los hechos que culminaron con la muerte de Maritere Herrera Cario.
Luego de un análisis detallado del expediente ante nuestra consideración y de la Transcripción Estipulada de la Prueba Oral, entendemos que no surge ni un ápice de pasión, prejuicio o parcialidad que justifique la substitución del criterio del foro sentenciador. Además, durante el juicio, la defensa del apelante tuvo oportunidad de contrainterrogar a los testigos de cargo y presentar evidencia a su favor, porque en el proceso judicial se salvaguardaron las garantías constitucionales de un juicio justo e imparcial y al debido proceso de ley. Por todo lo cual, consideramos que no incidió el jurado en el error alegado.
De otra parte, por circunscribirse los señalamientos de error dos, tres y cuatro a que no le fueron “descubiertos” varios documentos admitidos en evidencia, es decir, deficiencias en el descubrimiento de prueba, los analizaremos en conjunto.
De la Regla 95 de Procedimiento Criminal, 34 L.P.R.A. Ap. 11, R. 95, surge, en primer término, la obligación del Ministerio Público de revelar a la defensa prueba exculpatoria, ello independientemente del momento procesal y el que el imputado de delito solicitó tal descubrimiento. Se trata de un deber afirmativo “por exigencia del debido proceso de ley”. E. L. Chiesa Aponte, Derecho Procesal Penal de Puerto Rico y Estados Unidos, Colombia, Ed. Forum, Vol. 111, 1993, § 28.1, pág. 315 citando a Brady v. Maryland, 373 U.S. 83 (1963); Pueblo v. Rodríguez Sánchez, 109 D.P.R. 243, 246 (1979).
El requisito constitucional es “evitar un juicio injusto”, revelando “evidencia favorable o exculpatoria, y no sólo la obligación de no usar falso testimonio y corregir falso testimonio”. E.L. Chiesa Aponte, op. cit., 1992, Vol. 11, § 10.3, pág. 30; Pueblo v. Ortiz Vega, 149 D.P.R. 363 (1999) (relativo a declaraciones del principal testigo de cargo) y de información pertinente para impugnar su testimonio en corte: que trabajaba como informante remunerada para la policía).
Sin embargo, un reclamo bajo Brady v. Maryland, supra, “no obliga al Ministerio Público a entregar el sumario fiscal a la defensa, sino únicamente aquella evidencia favorable al acusado que, de ser suprimida, privaría a éste de un juicio justo”. United States v. Brady, 473 US 667, 675 (1985)(“the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the acussed, that, if suppressed, would deprive the defendant of a fair trial”) withholding or supresión of evidence by prosecution in criminal case as viciating conviction.” Félix v. Alpine, 34 A.L.R. 3d. 16.
La jurisprudencia sobre revelarle a la defensa evidencia exculpatoria se refiere siempre a “í tems evidenciarios”, como determinada declaración de un testigo. En el normativo de Brady v. Maryland, supra, se trataba de las declaraciones de un co acusado. En United States v. Agurs, 427 U.S. 97 (1976), se trataba del récord penal de la víctima, que incluya convicciones por delitos de violencia, lo que era *1015 importante en relación con la legítima defensa que alegaba el acusado. En United States v. Bagley, se trataba de evidencia que le servía a la defensa para impugnar al testigo de cargo por parcialidad: incentivo del testigo de cargo para declarar falsamente. En Kyles v. Whiteley, 514 U.S. 419 (1995), consistió en varios ítems evidenciarios: declaraciones originales de testigos de cargo con versión distinta al testimonio en corte, declaraciones inconsistentes del informante, que el informante estaba implicado en otros asesinatos y hechos que no estaban en armonía con la teoría del caso. Para que prospere una alegación sobre deficiencias perjudiciales por un descubrimiento de prueba deficiente es necesario que el apelante demuestre una violación a Brady v. Maryland, supra, estableciendo que la evidencia no descubierta hubiese sido exculpatoria o de valor impugnatorio. El criterio de materialidad constitutivo de una violación bajo Brady requiere una probabilidad razonable que, de haberse descubierto la evidencia y utilizada efectivamente por la Defensa, el resultado del procedimiento hubiera sido diferente. U.S. v. Bagley, 473 U.S. 667 (1986).
Más específicamente, en U.S. v. Blanco, 392 F.3d 382 (9th Cir. 2004), se expresó que si bien es cierto el que la evidencia de impugnación es evidencia favorable bajo Brady si la confiabilidad de ese testigo es concluyente para la determinación de inocencia o culpabilidad del acusado (“[i]mpeachment evidence is favorable Brady/Giglio material ‘when the reliability of the witness may be determinative of a criminal defendant’s guilt or innocence”). U.S. v. Blanco, 392 F. 3d, a la pág. 387.
Por otro lado, también se ha resuelto que la evidencia impugnatoria resulta inmaterial bajo Brady v. Maryland, supra, si ésta consiste en evidencia acumulativa o es materia de impugnación en cuanto a un asunto colateral. Conley v. U.S., 415 F.3d 183, 189 (1st Cir. 2005).
Así, para que el apelante pueda establecer una violación de esta norma, éste debe fundarse en que: (i) el Estado poseía la información que es favorable a su defensa; (ii) la Defensa no pudo obtenerla con razonable diligencia; (iii) el Ministerio Público suprimió la evidencia favorable; y (iv) la evidencia en cuestión, de haber sido descubierta, con razonable probabilidad hubiese cambiado el resultado del caso. U.S. v. Hansen, 626 F3d. 1217 (11th Cir. 2001).
Ninguno de los criterios antes mencionados se cumple en el caso ante nuestra consideración. El apelante señala que el Informe de Análisis Forense de la casa abandonada del Barrio Masas (Exhibit 5) que el Ministerio Público utilizó en el juicio fue editado y, por ende, era un informe distinto al que le fuera descubierto. (Alegato del Apelante, a la pág. 30). Ahora bien, el apelante no especifica en qué consistió la edición y como ello cambiaría el resultado de culpabilidad. Según se desprende de los autos en el juicio se argumentó sobre la edición en el Informe de Análisis Forense y sólo se trató de la inversión de la información, pero el contenido siempre ha sido el mismo. A esos efectos, el testimonio fue que: “Bueno hasta el momento, está invertida la conclusión con las notas como pa... pero dice lo mismo”. T.E., a la pág. 181. En vista de que el contenido de la información del documento es el mismo, y que la edición sólo consistió en un cambio en el orden en que se presentó la información, no cabe hablar aquí de una violación al debido proceso de ley suficiente para activar un reclamo de revocación de condena. Por consiguiente, el Jurado adjudicó adecuadamente el valor probatorio de un informe que, después de todo, no tuvo variación en la información que certificaba.
Con relación a los documentos relativos al registro de llamadas del número de celular de Maritere, (Alegato del Apelante, a la pág. 30), un análisis de dicha prueba arroja un resultado contundente a favor del Ministerio Público. En cuanto a este particular, el Ministerio Público señaló durante el juicio que cuando el señor Aponte Ortiz, representante de Cingular Wireless, declaró en el proceso ventilado contra Jonathan Orta Rodríguez, lo hizo a base del expediente, por lo que nunca se admitió en evidencia documento alguno. Así, indicó la fiscal que nunca tuvo ante sí el documento al que alude el testigo. T.E., a la pág. 348. El hecho de que el Ministerio Público, además de no tener control sobre la información, la desconociera, lleva a descartar que bajo este único argumento se pueda revocar la condena. Además del extenso contrainterrogatorio no se desprende en qué pudo *1016 haberse afectado los méritos de la adjudicación fáctica, toda vez que hubo efectiva impugnación y aun de eliminarse tales documentos, el resultado hubiese sido el mismo porque la información hubiera entrado a través del testimonio del representante de Centennial, quien precisó las llamadas que el apelante hizo a la occisa desde el celular que tomó prestado a Eli J. Pérez Nieves. Por consiguiente, la admisión de los documentos relativos a las llamadas que realizó y recibió la occisa en su número de celular, provistos por Cingular Wireless, de los cuales el Ministerio Público no tenía conocimiento de su existencia, no tuvo un efecto práctico en el desenlace del caso.
Por último, la documentación relativa a los Certificados de Análisis de Laboratorio Forense DNA, (Exhibit 23), como bien se señala en la página 702 de Transcripción de la Evidencia, fue corregida a los únicos fines de aclarar que la evidencia fue obtenida en el baúl del vehículo de la occisa y no en la casa abandonada del Barrio Masas. No se trata de una diferencia en el contenido; a esos efectos la señora Carmen A. Tirado Neris, Supervisora del Laboratorio Forense de DNA Serología del Instituto de Ciencias Forenses, explicó que los resultados son los mismos, sólo se trató de que invirtió los números de identificación de las piezas de evidencia y al corroborar la descripción con el número asignado se percató del error y procedió a corregirlo. T.E., a la pág. 721. Esta explicación fue constatada con la aclaración del Certificado Forense del lugar donde se encontraron las piezas de evidencia. Esta falta de precisión en nada altera los resultados científicos del análisis de las piezas de evidencia, sin importar el lugar donde se encontraron, y mucho menos constituye argumento válido para revocar un veredicto de culpabilidad como el de autos. Aun descartando dicho análisis forense, la demás evidencia documental y testifical sostienen la culpabilidad del apelante más allá de duda razonable. Los problemas acaecidos en cuanto al descubrimiento de prueba no fueron de tal naturaleza que cumplieran con los criterios de materialidad o trascendencia en el resultado de culpabilidad dispuestos en Brady v. Maryland, supra. Por consiguiente, cualquier deficiencia en cuanto al descubrimiento de prueba, aun si la asumiéramos como cierta, no altera el resultado de culpabilidad del apelante al analizar en su totalidad la prueba de cargo desfilada durante el juicio porJurado. Por lo cual, no incidió el Tribunal en los errores señalados.
En su quinto señalamiento de error adujo el apelante que incidió el Tribunal al demostrar prejuicio y parcialidad al no permitir un veredicto justo e imparcial por parte del jurado. Veamos la normativa aplicable.
Como mencionáramos, el juzgador de los hechos en primera instancia es el que, de ordinario, está en mejor posición para aquilatar la prueba testifical y dirimir su credibilidad, ya que fue él quien oyó y vio declarar a los testigos. Cabán Torres, 117 D.P.R., a la pág. 654.
La “determinación de si la prueba presentada demuestra o no la comisión de determinado delito —lo cual es una cuestión de hecho— compete exclusivamente al juzgador de los hechos”. Pueblo v. Bonilla Ortiz, 123 D.P.R. 434, 442 (1989). Esa determinación es revisable en apelación como cuestión de derecho. No obstante lo anterior, existe el estándar de revisión judicial que, de ordinario, los tribunales apelativos no intervendrán en la apreciación de la prueba realizada por los juzgadores de hechos en ausencia de pasión, prejuicio, parcialidad o error manifiesto y a menos que la apreciación de la evidencia se aleje de la realidad fáctica o la prueba sea inherentemente imposible o increíble. Pueblo v. Acevedo Estrada, 150 D.P.R. 84, 99 (2000).
Las determinaciones que hace el juzgador de los hechos no deben ser descartadas arbitrariamente, ni tampoco, deben sustituirse por el criterio del foro apelativo, a menos que de la prueba.admitida surja que no existe base suficiente que apoye tal determinación. Pueblo v. Acevedo Estrada, supra.
En el caso de autos, el Ministerio Público probó más allá de duda razonable los delitos imputados con prueba satisfactoria, suficiente en derecho y según percibida por los testigos de cargo, particularmente el testimonio de varias amistades del apelante, fueron consistentes entre sí. Así como el testimonio de familiares del co acusado y el padre de la occisa, que establecieron que el apelante y la occisa se conocían. A estos *1017 testimonios, el Jurado, juzgador de los hechos, otorgó total crédito y no hay nada en los autos que impugne dicha apreciación.
El apelante fue hallado culpable de asesinato y violación al Art. 5.05 de la Ley de Armas de Puerto Rico. Con la prueba vertida durante el juicio en su fondo quedaron probados cada uno de los elementos de los delitos por los cuales se emitió el fallo de culpabilidad. Como surge del testimonio de Eli Javier, amigo del apelante, el día de los hechos (25 de octubre de 2004), en horas de la tarde, poco después de las 4:00 p.m., a las 5:00 p.m. y hasta aproximadamente las 7:30 p.m., el apelante le pidió que le prestara su celular y realizó varias llamadas al celular de Maritere. Dicho testimonio fue corroborado con la documentación que sometiera el proveedor del celular de la occisa (Centennial de Puerto Rico), así como el proveedor del celular que utilizara el apelante (Cingular Wireless). Tras las llamadas, el apelante se marchó del lugar en compañía del co acusado. Posteriormente, regresó al negocio de las verduras, pero en otro vehículo marca Honda color rojo y al cuestionársele sobre su procedencia indicó que era de una amiga. Estando en el lugar el apelante, a preguntas de Eli Javier, dijo que el Honda le pertenecía a una amiga que la habían asesinado, y de inmediato abrió un poco el baúl y Eli Javier pudo observar la silueta de un cuerpo. Inmediatamente, el co acusado le cuestionó al apelante su proceder e indicó que si estaba loco y acto seguido cerró el baúl. Esta información también fue corroborada por el testimonio de varios de los presentes (Israel Pérez Nieves, Carlos Iván, Ángel José Orta). Luego que esto, el apelante y el co acusado se marcharon del lugar, conduciendo el Honda, y detrás le siguieron Oscar y Ángel José alias Wiso, porque el co acusado les había solicitado que lo acompañaran a dejar el vehículo en casa de la hermana del apelante. Al llegar a una intersección en un paraje solitario y oscuro en Cidra, donde, según el testimonio de Ángel José, el apelante le pidió al co acusado que buscara un objeto para colocar en el acelerador, a lo que éste encontró un canasto marca “Fisher Price” y lo colocaron en el acelerador del Honda, yéndose el vehículo risco abajo. Acto seguido el apelante, el co acusado y Wiso corren para montarse en el vehículo de Oscar. Después, se detuvieron en una gasolinera en la que había una ATH y el apelante le solicitó al co acusado que retirara dinero con la tarjeta de ATH de Maritere, sin que ello rindiera fruto. Entonces, según la prueba, tanto el apelante como el co acusado manifestaron que ella (Maritere) se lo buscó en vano. Luego de transcurrir varios días, el apelante, el co acusado y Carlos Iván fueron a la residencia abandonada sita en el Barrio Masas de Gurabo donde los primeros dos habían asesinado a Maritere, con el propósito de eliminar la evidencia del delito; en específico, comenzaron a pintar con pintura en aerosol las manchas de sangre que habían en el lugar. Estando allí, el apelante comenzó a narrarle a Carlos Iván la forma en que la golpeó con un cuartón, la degolló y ésta se desplomó. T.E., a las págs. 607-609. Esta información fue corroborada con múltiples informes forenses y el propio informe de patología que índica que Maritere recibió un fuerte golpe con un objeto contundente que provocó una fractura craneal seria y descompensó su capacidad de defenderse. Con estos hechos, no podemos concluir que el Jurado actuó con prejuicio, parcialidad o error manifiesto, al determinar que el apelante está conectado con la ejecución de los hechos delictivos que se le imputan, razón por la cual no existen fundamentos para que este foro intervenga con la apreciación de la prueba que realizara el jurado.
En vista de lo anterior, en ausencia de indicios de prejuicio, parcialidad o error manifiesto, no debe revocarse la convicción a base de un planteamiento de insuficiencia de prueba, cuando éste se reduce a uno de credibilidad de testigos. Pueblo v. Hernández Mercado, 126 D.P.R. 427, 446 (1990).
El apelante no ha demostrado que el Jurado haya cometido un error manifiesto al dirimir el conflicto en la prueba que le fue presentado, ni que actuó movido por pasión, prejuicio o parcialidad.
En su discusión de este señalamiento, el apelante también cuestionó la admisión en evidencia del video de la escena que muestra el cuerpo de la víctima por constituir, según él, prueba inflamatoria para el jurado. Vale destacar que dicho video muestra las condiciones del cadáver de la joven Maritere y fue tomado por un técnico del Instituto de Ciencias Forenses al momento de investigar la escena donde se halló. El apelante señala que el video carece de valor probatorio, pero sí de carácter inflamatorio para el Jurado al amparo de las disposiciones de la Regla 19 de Evidencia. Según establece dicha regla, el tribunal tiene discreción para excluir evidencia *1018 pertinente aunque no haya regla de exclusión aplicable. Pero esa discreción del Tribunal de Primera Instancia está enmarcada en la correspondiente objeción de la defensa a la presentación de determinada evidencia. Nuestro esquema jurídico ha establecido la exclusión de fotografías en casos donde ellas exponían el cadáver de la víctima en juicio por asesinato. Pueblo v. Ortiz Rodríguez, 103 D.P.R. 368, 372 (1975). En dicho caso nuestro Tribunal Supremo expuso:
“Son admisibles fotografías para ilustrar hechos sobre los cuales se ha declarado, Pueblo v. Torres, 75 D.P.R. 231, 235 (1953); para demostrar el número de heridas, Pueblo v. Pacheco Stevenson, 83 D.P.R. 842, 848 (1961); para corroborar el testimonio de un testigo, Pueblo v. Rodríguez Colón, 95 D.P.R. 614, 617-618 (1967); para probar cualquier cosa que sea pertinente sobre la cual un testigo puede dar una descripción oral, pues las fotografías son una representación del estado de cosas que están en controversia. Pueblo v. Márquez, 67 D.P.R. 326, 335 (1947). El mero hecho de que una fotografía pueda impresionar al jurado desfavorablemente para el acusado no justifica su exclusión. Pueblo v. Zayas Ortiz, 65 D.P.R. 538, 541 (1946); Pueblo v. Rivera, 69 D.P.R. 538, 541 (1949). Ello es así, porque el jurado debe conocer todo lo relacionado con el caso que juzga para estar en mejores condiciones de rendir un veredicto justo. Pueblo v. Rivera, 83 D.P.R. 471, 483 (1961). La manera más eficaz para no impresionar adversamente a un jurado es no cometer un crimen.” Id. a la pág. 372.
El Tribunal Supremo ha reconocido que al evaluar este tipo de señalamiento de error, no se debe asumir que el Jurado tiene una sensibilidad extrema y que el simple hecho de que la fotografía (en este caso, el video) pueda impresionar desfavorablemente al Jurado no justifica su exclusión. Pueblo v. López Rodríguez, 118 D.P.R 515, 543 (1987).
En un caso por jurado, Pueblo v. Rivera Romero, 83 D.P.R. 471, 483, 484 (1961), al igual que el de autos, nuestro Tribunal Supremo analizó la solicitud de exclusión de ciertas fotografías de la víctima de la siguiente forma:
El acusado alega que la presentación de esta serie de fotografías le perjudicaron, pues tenían que producir reacción de dolor, de lástima, de compasión {D.P.R. 483} para con las víctimas y sus deudos. No creemos que a los jurados deban mantenérsele aislados de los hechos que precisamente van a juzgar. No podemos presumir que sean personas de sensibilidad extrema, que el menor contacto con cualquier incidente, en casos de asesinato o de cualquier otro delito que estén juzgando, le afecte su ánimo en tal forma que le impida rendir un veredicto imparcial. Ellos deben conocer todo lo relacionado con el caso que juzgan para estar en mejores condiciones de rendir un veredicto. Id., a las págs. 483-484.
En síntesis, el Tribunal Supremo ha sostenido la presentación en evidencia de fotografías (videos) en aquellos casos donde su valor probatorio supere el impacto perjudicial que las mismas podían tener sobre el jurado. Así también, ha ordenado la exclusión de evidencia que resulte innecesaria o acumulativa, ello reconociendo el principio de que a los tribunales de instancia poseen gran discreción bajo la Regla 19 de Evidencia y sus determinaciones merecen deferencia. Con ello en mente, nos corresponde examinar si el magistrado abusó de su discreción al no excluir el video considerando el alegado perjuicio indebido frente a su valor probatorio.
A tenor con la jurisprudencia antes citada debemos concluir que el señalamiento del apelante no tiene méritos, particularmente, cuando en el caso de autos la escena donde fue hallado el vehículo de la occisa con su. cuerpo en el baúl era una boscosa, oscura y cubierta de neblina. Entendemos que la admisión del video además de las fotos como evidencia demostrativa de alto valor probatorio porque sirvió el propósito de ilustrar la escena difícil en la que se halló el vehículo y, posteriormente el cadáver, las lesiones que presentó el cadáver, también para “corroborar la veracidad de lo declarado en cuanto “a localización geográfica de la escena del crimen y áreas susceptibles de percepción visual por los testigos”, Pueblo v. Pagán Díaz, 111 D.P.R. 608, 618 (1981), y de los investigadores forenses que trabajaron la escena.
*1019 Aun asumiendo para fines de argumentación que el tribunal de instancia hubiere cometido error al admitir el video, dicha admisión no constituye un error que acarree revocación, sino del típico “harmless error”. No estaríamos ante una admisión errónea que constituiría un “factor decisivo o sustancial en la sentencia o decisión que amerite la revocación, pues el resultado sería el mismo, a saber, la culpabilidad del apelante.” Pueblo v. Mangual Hernández, 111 D.P.R. 136, 145 (1981).
En síntesis, un examen detenido de los autos nos lleva a concluir que la apreciación del juzgador no es ajena a la realidad de los hechos, por lo cual no incidió el Tribunal en el error señalado.
Como sexto y último señalamiento de error el apelante adujo que la inutilización sufrida por uno de los videos presentados al jurado durante el juicio impide una completa y adecuada apelación debido a la imposibilidad de apreciar su efecto de perjuicio indebido sobre el jurado, razón por la cual se debe ordenar la celebración de un nuevo juicio. No le asiste la razón. Veamos.
El derecho de apelar una sentencia es estrictamente de carácter estatutario y forma parte del debido proceso de ley, para el cual también se requiere una adecuada y efectiva representación legal. Pueblo v. Ortiz Couvertier, 132 D.P.R. 883, 892 (1993). En este sentido, aunque la transcripción de la evidencia forma parte esencial de una apelación criminal en la que se cuestione la apreciación de la prueba, lo que se ha interpretado como un derecho del apelante, su omisión no acarrea la revocación de la sentencia apelada. Ante tal situación, resulta más adecuado examinar primero el perjuicio ocasionado al apelante. Sobre ello, algunos Circuitos del Tribunal Apelativo federal han adoptado, como criterio, que el apelante demuestre que la porción de la transcripción o video omitida le ocasionó un daño específico a su apelación. United States v. Carrillo, 902 F.2d 1405 (9th Cir. 1993); United States v. Gillis, 773 F.2d 549, 554 (4th Cir. 1985). Le corresponde al acusado demostrar que existe una razonable probabilidad de que si no hubiere sido por el defecto del video, el resultado del procedimiento hubiera sido diferente. Compárese con, Strickland v. Washington, 466 U.S. 668, 685 (1984).
En el caso de autos, no están presentes los elementos para determinar que el daño o defecto en el video a nivel del proceso de apelación constituye causa suficiente para ordenar un nuevo juicio. Nótese que el video que se deterioró sólo mostraba imágenes de la escena, la cuales fueron recogidas en fotografías admitidas en evidencia tomadas por los investigadores forenses que declararon en juicio y que describían visualmente los relatos de los demás testigos sobre la forma en que fue hallado el vehículo y el cuerpo de Maritere. Además para la adecuada preparación para la apelación se requería el examen de los autos y la transcripción de los procedimientos, no siendo indispensable para preparar la argumentación de los errores observar el video, máxime cuando éste sólo muestra en movimiento lo capturado por las fotografías. La precisión y certeza sobre lo ocurrido en el Tribunal de Instancia está recogido en la transcripción y su análisis era suficiente para elaborar un alegato de apelación responsable. Nos parece desacertado que el apelante sostenga que la sola inutilización de uno de los videos mostrados al jurado es causa suficiente para revocar la determinación apelada. Máxime cuando el foro a quo recibió evidencia suficiente tanto testifical como documental para concluir más allá de duda razonable la culpabilidad del apelante en el asesinato de la joven Maritere.
IV
Por los fundamentos antes expuestos, confirmamos las Sentencias dictada contra el apelante Alexander Mangual Toledo el 27 de enero de 2006, por el Tribunal de Primera Instancia, Sala de Caguas.
Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.
Dimarie Alicea Lozada
Secretaria del Tribunal de Apelaciones